TOYOTA MOTOR SALES,
U.S.A., INC., Plaintiff,

v.

UNITED STATES, Defendant,

and

NACCO Materials Handling Group, Inc., Independent Lift Truck Builders Union, International Association of Machinists AMD Aerospace Workers, International Union, Allied Industrial Workers of America (AFL–CIO), & United Shop and Service Employees, Defendant–Intervenors.

Slip Op. 98–95.
Court No. 97–03–00415.

United States Court of
International Trade.

July 2, 1998.

Dorsey & Whitney LLP (John B. Rehm, Munford Page Hall, II, L. Daniel Mullaney, Robert W. Bras ), Washington, DC, for Plaintiff.

Frank W. Hunger, Assistant Attorney General of the United States; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Lesleyanne Koch Kessler ); Bernd Janzen, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, Washington, DC, for Defendant.

Collier, Shannon, Rill & Scott, PLLC (Paul C. Rosenthal, Mary T. Staley ), Washington, DC, for Defendant-Intervenors.

## OPINION

CARMAN, Chief Judge.

Before the Court is plaintiff's Motion for Judgment on the Agency Record pursuant to U.S. CIT R. 56.2. Plaintiff, Toyota Motor Sales, U.S.A., Inc., ("Plaintiff"or "Toyota") argues the Department of Commerce's (Department or Commerce) determination in *Certain Internal–Combustion Forklift Trucks From Japan; Final Results of Antidumping Duty Administrative Review*, 62 Fed.Reg. 5,592 (Feb. 6, 1997) (*Final Results* ) is not supported by substantial evidence on the record and is not otherwise in accordance with law. Plaintiff raises three issues in challenging the *Final Results*. First, plaintiff argues Commerce improperly utilized facts otherwise available, specifically Toyota's United States credit revenue, to value Toyota's home market credit revenues. Second, plaintiff contends Commerce's rejection of verified direct and indirect selling expenses incurred by plaintiff in Japan is not supported by substantial evidence on the record and is not otherwise in accordance with law. Finally, plaintiff asserts Commerce's calculation of constructed export price (CEP) profit is not supported by substantial evidence on the record and is not otherwise in accordance with law because it is based on the combined profits from sales of large and small forklift trucks, which plaintiff contends are different foreign like products.

In response, defendant argues Commerce's determination is supported by substantial evidence on the record and is otherwise in accordance with law. Defendant contends Commerce properly resorted to adverse facts otherwise available, pursuant to 19 U.S.C. §§ 1677e(a) and (b), when it: (1). denied Toyota's claimed direct and indirect selling expenses as adjustments to normal value; (2). included the claimed selling expenses in the adjusted home-market price for purposes of constructed value (CV) and the sales-below-cost test; and (3). used the claimed selling expense in calculating the CEP profit in

the case of the claimed direct advertising expense incurred from United States sales. Defendant contends Commerce properly applied the transaction-specific gross revenue earned by Toyota Motor Credit Corporation on relevant U.S. sales to the weighted-average home market price of matched sales. Defendant further maintains Commerce properly calculated a single CEP profit based upon all subject merchandise and foreign like product for forklift trucks.

Defendant–Intervenors, NACCO Materials Handling Group, Inc., Independent Lift Truck Builders Union, International Association of Machinists and Aerospace Workers, International Union, Allied Industrial Workers of America (AFL–CIO), and the United Shop and Service Employees, (collectively NACCO) oppose plaintiff's Motion for Judgment on the Agency Record and support defendant's position. Defendant–Intervenors argue because Toyota was unable at verification to provide documents to support claims made in its questionnaire responses, Commerce was required to apply facts otherwise available with respect to the claims which could not be verified. Defendant–Intervenors contend the Department reasonably determined that the statutory preference is a single CEP profit for all sales under consideration.

This Court has jurisdiction under 28 U.S.C. § 1581(c) (1994), and for the reasons set forth below, denies plaintiff's Motion for Judgment on the Agency Record, sustains Commerce's *Final Results* in their entirety, and dismisses this action.

### BACKGROUND

On June 7, 1988, Commerce issued an anti-dumping duty order on certain internal–combustion, industrial forklift trucks from Japan. *See Antidumping Duty Order and Amendment to Final Determination of Sales at Less Than Fair Value; Certain Internal–Combustion, Industrial Forklift Trucks From Japan,* 53 Fed.Reg. 20,882 (Dep't Comm.1988). In June 1995, Commerce published a notice informing interested parties of their opportunity to request an administrative review of the antidumping duty order on forklift trucks from Japan. *See Antidump-*

*ing or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review,* 60 Fed.Reg. 29,821, 29,822 (Dep't Comm.1995). On August 16, 1995, pursuant to a request from the domestic producers, Commerce published a notice of its initiation of the fourth administrative review of forklift trucks from Japan exported by Toyota Motor Corporation (TMC) and two other respondents for the period June 1, 1994 to May 1, 1995. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocation in Part,* 60 Fed.Reg. 42,500, 42,501 (Dep't Comm.1995). The products covered by the review are "certain internal-combustion industrial forklift trucks, with lifting capacity of 2,000 to 15,000 pounds" and are further described as "[a]ssembled, not assembled, and less than complete, finished and not finished, operator-riding forklift trucks powered by gasoline, propane, or diesel fuel internal-combustion engines of off-the-highway types used in factories, warehouses, or transportation terminals for short-distance transport, towing, or handling of articles." *Final Results,* 62 Fed. Reg. at 5,592.

In conducting its investigation in the fourth administrative review, Commerce forwarded to Toyota an antidumping questionnaire on July 31, 1995 and included the following instruction:

If you fail to provide accurately the information requested within the time frame provided, the Department may be required to base its findings on the facts available. If you fail to cooperate with the Department by not acting to the best of your ability to comply with a request for information, the Department may use information that is adverse to your interest in conducting its analysis.

(July 31, 1996 Antidumping Questionnaire to Toyota, *reprinted in* Def.'s App. to Mem. in Opp'n to Pl.'s Mot. for J. Upon Agency R. (Def.'s App.) at 2.) On October 16, 1995, Toyota submitted its principal questionnaire response.

On April 19, 1996, Commerce sent Toyota a supplemental questionnaire, informing it that Commerce had identified several areas

in its October 1995 response that required further information or clarification. First, Commerce attempted to confirm whether Toyota accurately reported its claimed selling expenses for home market advertising and certain indirect selling expenses. Second, the Department attempted to confirm Toyota's claim that its related financing company in Japan, Toyota Finance Corporation (TFC), was not involved in any aspect of forklift truck sales made in the home market. Commerce requested additional information with respect to Toyota's credit expenses and stated

> Please explain the apparent discrepancy between your statement that TMC had no short-term borrowing during the [period of review (POR)] and your 1995 audited financial statements which indicate TMC did carry short-term debt. Please explain why you believe this does not constitute short-term borrowing for the POR. Please provide the equation you used to calculate credit expenses and a worksheet showing the calculation of your average short-term interest rate.

> Is Toyota Finance Corporation (TFC) involved in any financing transactions between [Toyota Automatic Loomwork] or TMC and its affiliated and unaffiliated dealers? If so, please explain its involvement and the various programs available and utilized during the period of review.

(Letter from Laurie Parkhill, Office of Antidumping Compliance, to TMC of Apr. 19, 1996, *reprinted in* Def.'s App. at 25, 33.)

On May 1, 1996, Commerce informed Toyota of its intent to conduct verification of Toyota's factual submissions and forwarded a verification outline to Toyota, explaining that Commerce planned to examine certain source documents, including Toyota's financial statements covering the period of review. Commerce conducted on-site verification of Toyota's factual submissions and outlined eleven specific deficiencies, several of which are relevant to Toyota's challenges to the *Final Results*. For example, Commerce indicated Toyota was unable to provide documentation in support of some of its claimed indirect selling expenses and home market direct advertising expenses. Commerce explained

> We could not verify TMC's indirect advertising and sales-promotion expenses and indirect selling expenses (wage & salary and general and administrative expenses). Therefore, we are denying them as adjustments to normal value....

> We could not verify TMC's reported direct advertising expenses. Therefore, we are denying them as adjustments to normal value....

(Commerce's Preliminary Results Analysis Memorandum, dated July 26, 1996, *reprinted in* Def.'s App. at 52, 55.) Commerce also explained

> Toyota could not go below the level of a semi-annual detail report to support certain of its claimed indirect selling expenses reported under its variable INDIRSH (Sales Promotion and Advertising, Wage & Salary and General Administrative).

> Toyota could not go below the level of a semi-annual detail report to support its claimed home market direct advertising expense (ADVERTH).

(Commerce Verification Report, dated Aug. 12, 1996, *reprinted in* Def.'s App. at 56, 57.)

On August 2, 1996, Commerce published its preliminary results for the fourth administrative review. *See Certain Internal–Combustion Industrial Forklift Trucks From Japan; Preliminary Results of Antidumping Duty Administrative Review*, 61 Fed.Reg. 40,400 (Dep't Comm.1996) (prelim.determ.) (*Preliminary Results*). In the *Preliminary Results*, Commerce denied Toyota's claimed indirect expenses (INDIRSH) and direct advertising expenses (ADVERTH) as downward adjustments to normal value finding them unverifiable, but included the claimed expenses in its calculations of constructed value and sales-below-cost test. The *Preliminary Results* also indicated Commerce "made an adjustment for an amount of profit allocated to [CEP] expenses in accordance with section 772(d)(3) of the Act [19 U.S.C. § 1677a(d)(3)]." *Preliminary Results*, 61 Fed.Reg. at 40,401. Toyota's challenges to the *Preliminary Results* are consistent with its present lawsuit.

Commerce published its final determination of the fourth annual antidumping duty

administrative review without altering its findings from the *Preliminary Results*. *See Final Results*, 62 Fed.Reg. at 5,592. Commerce explained it "determined that the use of facts available is appropriate for certain portions of [the] analysis of Toyota's data." *Id.* First, Commerce stated under 19 U.S.C. § 1677e(a)(1)(D), "the use of facts available for certain home market selling expenses and home market credit revenue is appropriate for Toyota because we were unable to verify the accuracy of the information Toyota submitted." *Id.* at 5,593. Second, Commerce explained that:

> by not providing certain basic verification documents that were essential to the establishment of the accuracy of the data submitted (*e.g.*, expense ledgers for certain selling expenses and an affiliated company's (Toyota Finance Corporation, "TFC") financial statements), Toyota did not cooperate to the best of its ability to comply with our requests for such information. Accordingly, our resort to an adverse inference with respect to these items is appropriate and fully in accord with law.

*Id.* at 5,593–94. Third, Commerce indicated it used as much of Toyota's submitted factual information as could be verified, and hence, maintains the final results were not overly punitive. Finally, Commerce explained the application of facts otherwise available is decided on a case-by-case basis, depending upon the circumstances of each investigation or administrative review, and that, in this case, "the information requests at issue were routine verification requests that in no way constituted an unreasonable burden on Toyota." *Id.* at 5,594.

### CONTENTIONS OF THE PARTIES

#### A. *Plaintiff*

Plaintiff raises three issues in challenging the *Final Results*. First, plaintiff argues the Department's utilization of Toyota's United States credit revenue as facts otherwise available in determining Toyota's home market credit revenues is not supported by substantial evidence on the record and is not otherwise in accordance with law. Plaintiff additionally contends Commerce's deliberate use of adverse inferences, in response to Toyota's inability, despite its best efforts, to produce certain documents on short notice and within a short period of time is disproportionately punitive, is not supported by substantial evidence on the record, and is not otherwise in accordance with law. Plaintiff argues even if the Department were justified in imputing credit revenue to home market sales, the Department's addition of gross, instead of net, credit revenue is not supported by substantial evidence on the record and is not otherwise in accordance with law. Plaintiff maintains the Court should instruct the Department to find Toyota received no credit revenue on its home market sales.

Second, Plaintiff contends the Department's rejection of verified direct and indirect selling expenses incurred by TMC in Japan is not supported by substantial evidence on the record and is not otherwise in accordance with law. Plaintiff contends Commerce's manipulation of reported expenses to maximize the punitive effect as adverse facts otherwise available, despite plaintiff's best efforts to obtain the documents requested by Commerce at verification, is disproportionately punitive, is not supported by substantial evidence on the record and is not otherwise in accordance with law. Plaintiff asks the Court to instruct Commerce to accept its claimed direct and indirect selling expenses incurred in Japan.

Finally, plaintiff argues Commerce's calculation of CEP profit based on the combined profits from sales of large and small forklift trucks is not supported by substantial evidence on the record and is not otherwise in accordance with law. Plaintiff requests the Court to instruct Commerce to base its CEP profit calculations solely on the prices and expenses of the large forklift trucks, which plaintiff contends are the foreign like product in this case.

#### B. *Defendant*

Defendant opposes plaintiff's motion and argues the *Final Results* should be sustained. Defendant contends "Toyota was unable to support some of its circumstances-of-sale adjustments with detailed source documentation at verification." (Def.'s Mem. in Opp'n to Pl.'s Mot. for J. Upon Agency R.

(Def.'s Br.) at 13.) Defendant further contends "Toyota could have, but did not, provide the monthly breakdowns for these expenses, despite Toyota's knowledge that '[i]t is standard Department practice to review source documentation at a level of detail greater than a semi-annual report.'" (*Id.* at 14 (quoting *Final Results,* 62 Fed.Reg. at 5,595).) Defendant maintains Commerce properly utilized adverse facts otherwise available, pursuant to 19 U.S.C. §§ 1677e(a) and (b), when it: (1). denied Toyota's claimed direct and indirect selling expenses as adjustments to normal value; (2). included Toyota's claimed selling expenses in the adjusted home-market price for purposes of CV and the sales-below-cost test; and (3). used the claimed selling expense in calculating CEP profit in the case of the claimed direct advertising expense incurred from U.S. sales. Defendant argues "Commerce's approach, [sic] constitutes a rational response to Toyota's failure to cooperate to the best of its ability." (*Id.*)

Defendant additionally argues 19 U.S.C. § 1677e(a) allows Commerce to use facts otherwise available when it is unable to verify information provided by a respondent. Defendant maintains in this case

> Toyota failed to provide verifiable information regarding the financing of its forklift sales in the home market. Even though Toyota had received sufficient notice that the Department would seek to verify Toyota's claim that TFC was not involved in forklift sales in the home market, Toyota did not, when requested, provide Commerce verifiers with TFC's financial statements.... Toyota's failure precluded Commerce from ascertaining what, if any, financing arrangements Toyota had provided its domestic forklift customers during the POR.... Commerce's adverse facts available determination is reasonable, supported by substantial evidence, and otherwise in accordance with law.

(*Id.* at 14–15.)

### C. *Defendant–Intervenors*

Defendant–Intervenors oppose plaintiff's Motion for Judgment on the Agency Record and argue because Toyota was unable at verification to provide documents to support claims made in its questionnaire responses, documents that are typically provided during verification and that were identified as possible source documents in the Department's verification outline, Commerce was required to apply facts otherwise available with respect to the claims which could not be verified. Defendant–Intervenors further contend the Department indicated to Toyota in its verification outline that financial statements might be the type of document the Department would review at verification, and "Toyota's failure to provide this basic source document fully supports the Department's use of facts available." (Def.-Intvs.' Opp'n to Pl.'s Mot. for J. Upon Agency R. (Def.-Intvs.' Br.) at 12.) Defendant–Intervenors assert the Department properly found that Toyota failed to substantiate its claim that neither it nor TFC earned credit revenue on its home market sales and therefore properly resorted to facts available. Defendant–Intervenors also contend the Department reasonably determined the statutory preference is a single CEP profit for all sales under consideration.

### STANDARD OF REVIEW

In reviewing a final determination by Commerce, this Court must sustain the determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994). Substantial evidence is that which "'a reasonable mind might accept as adequate to support a conclusion.'" *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (citation omitted), *quoted in Matsushita Elec. Indus. Co., Ltd. v. United States,* 3 Fed Cir. (T) 44, 51, 750 F.2d 927, 933 (1984). For purposes of judicial review, the evidence before this Court is limited to the evidence contained in the administrative record. *See Neuweg Fertigung GmbH v. United States,* 16 CIT 724, 726, 797 F.Supp. 1020, 1022 (1992). The Court is not to substitute its own determination for the agency's but rather is to determine whether Commerce's determination is supported by substantial evidence on the record and is otherwise in accordance with law. *See, e.g., Consolo v. Federal Maritime Comm'n,* 383

U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) (noting "the possibility of drawing two inconsistent conclusions from the evidence does not permit an administrative agency's finding from being supported by substantial evidence"); *Universal Camera Corp.*, 340 U.S. at 488, 71 S.Ct. at 465, 95 L.Ed. at 467–68 (reviewing court may not "even as to matters not requiring expertise ... displace the [agency's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo* ").

■ In determining whether Commerce's interpretation and application of the antidumping statute is in accordance with law, this Court applies the two-step test set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *Chevron* first directs the Court "to determine whether Congress has directly spoken to the precise question at issue." *Id.* at 842–43, 104 S.Ct. 2778 (internal quotations and citations omitted). If the statute is unambiguous as to the issue at hand, then the court must give effect to the intent of Congress. *Id.* However, "[i]f the statute is silent or ambiguous with respect to the specific issue, the question for the Court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778 (footnote omitted). Thus, the second element of the *Chevron* test directs the Court to consider the reasonableness of an agency's interpretation. The Court must accord substantial weight to the agency's interpretation of a statute it administers. *See American Lamb Co. v. United States,* 4 Fed. Cir. (T) 47, 54, 785 F.2d 994, 1001 (1986). While Commerce has discretion in choosing one interpretation over another, "[t]he traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress." *Board of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.,* 474 U.S. 361, 368, 106 S.Ct. 681, 686, 88 L.Ed.2d 691 (1986), *cited in Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 405, 636 F.Supp. 961, 966 (1986) ("[T]his Court will not allow an agency, under the guise of lawful discretion, to contra-

vene or ignore the intent of the legislature or the guiding purpose of the statute"), *aff'd,* 5 Fed. Cir. (T) 77, 810 F.2d 1137 (1987).

## DISCUSSION

### I. *Commerce's Use of Facts Otherwise Available*

■ In the *Final Results,* Commerce determined with respect to the issue of Toyota's expenses:

In light of Toyota's inability to establish the accuracy of the data that it submitted regarding its home market direct advertising and home market indirect selling expenses, we were unable to include these reported expenses as adjustments to home market price in determining [normal value].. . .

This approach is consistent with the Department's practice in other cases. . . .

The same approach with respect to Toyota's selling expenses is appropriate, given Toyota's failure to provide basic source documentation at verification. . . . It is standard Department practice to review source documentation at a level of detail greater than a semi-annual report and to require documentation that ties reported expenses to a company's financial statements. Accordingly, we were unable to verify the accuracy of these claimed expenses.

Our verification report reveals that, while Toyota succeeded in providing detailed support documentation for other expenses, it was unprepared to provide sufficient and necessary documentation to support the expenses at issue. . . .

. . . .

. . . This is true despite clear instructions in the Department's verification outline of the need to be prepared to provide such documentation. . . .

. . . [B]ecause we could not verify the relevant information, the use of facts available for these expenses is an appropriate measure in this review. In addition, in light of Toyota's failure to provide basic source documentation regarding the expenses at issue, along with the fact that

the company was given sufficient notice that such documentation would be required at verification, we have determined that Toyota has failed to cooperate by not acting to the best of its ability to comply with our requests for information.

*Final Results,* 62 Fed.Reg. at 5,594–95.

Sections 1677e (a) and (b) of title 19, United States Code, which provides the basis for Commerce's determination on this issue, provide, in pertinent part:

(a) In general

If—

. . .

(2) an interested party or any other person—

. . .

(C) significantly impedes a proceeding under this subtitle, or

(D) provides such information but the information cannot be verified as provided in section1677m(i) of this title,

the administering authority and the Commission shall, subject to section 1677m(d) of this title, use the facts otherwise available in reaching the applicable determination under this subtitle.

(b) Adverse Inferences

If the administering authority or the Commission (as the case may be) finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the administering authority or the Commission, the administering authority or the Commission (as the case may be), in reaching the applicable determination under this subtitle, may use an inference that is adverse to the interests of the party in selecting from among the facts otherwise available. . . .

19 U.S.C. § 1677e(a) and (b) (1994).

Plaintiff argues the Department's use of facts otherwise available with respect to its reported home market indirect selling expenses, home market direct advertising expenses, and direct U.S. selling expenses incurred in Japan in response to plaintiff's

inability, despite its best efforts, to produce certain documents, is inappropriately punitive. Toyota asserts the Department's use of facts otherwise available, where an interested party provides information but it cannot be verified, is governed by a two-part inquiry. According to the plaintiff, 19 U.S.C. § 1677e(a)(2)(D) [1] allows the Department to use facts otherwise available if certain conditions are met and further permits the Department to draw adverse inferences against a party only if "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b) (1994). Plaintiff argues, "the Department's use of facts available and adverse inferences in this review meets none of the above-enumerated statutory conditions." (Pl.'s Br. in Supp. of Mot. for J. Upon Agency R. (Pl.'s Br.) at 5.) Plaintiff further contends

[e]vidence on the record demonstrates that all necessary information was on the record for the Department's determination; that Toyota withheld nothing, and either did provide, or would have provided if given sufficient notice, the information requested in a timely manner; that Toyota did not in any way impede the proceeding; and that the Department did, contrary to its suggestions, verify Toyota's information in a manner identical to previous proceedings.

(*Id.*) Plaintiff contends the substantial documentation it prepared in advance of verification, including the worksheets and financial records used in assembling the questionnaire responses, allowed the Department to verify the data tied to Toyota's semi-annual expense reports and to verify and trace Toyota's allocation for these expenses.

Plaintiff contends the Department could not properly resort to facts otherwise available in this case because none of the conditions set out in 19 U.S.C. § 1677e(a) was satisfied and "[a]ll the information necessary to the Department's determination is on the record and was, as stated in the Department's verification report, verified." (*Id.* at 22.) Plaintiff further argues "[t]he verifica-

---

**1.** Plaintiff appears to be referring to 19 U.S.C. § 1677e(a)(2)(D) but mistakenly cited to § 1677e(b)(2)(D) in its brief. (Pl.'s Br. in Supp. of Mot. for J. Upon Agency R. (Pl.'s Br.) at 4.)

tion report recognizes that these expenses were verified, and that it was only 'further exploration' into 'ancillary and additional' information that the Department was not able to pursue." (*Id.* at 23.) Plaintiff adds, "[m]oreover, the monthly breakdowns which were requested do not provide any information relevant to the Department's inquiry that is not already provided by the semi-annual reports." (*Id.*) Plaintiff maintains it "did not withhold or fail to provide information requested in a timely manner and in the form required", (*id.*), and "[t]he facts demonstrate that Toyota cooperated to the best of its ability, but was simply unable to supply requested documentation that would, in any case, have been duplicative of the information already provided. Under these circumstances, the use of adverse 'facts available' is clearly inappropriate." (Pl.'s Mem. in Reply to Opp'n of Def. and Def.-Intvs. (Pl.'s Reply) at 14.) Toyota concludes it

> did not withhold or fail to provide information requested in a timely manner and in the form required, but, rather, prepared for verification on the reasonable assumption that the level of documentary support sought by the Department at previous verifications would be sufficient at this verification. In light of this cooperation, the Department's use of facts available as a substitute for Toyota's verified expense data is unwarranted, unsupported, and is contrary to law and the Department's regulations.

(Pl.'s Br. at 25.)

Plaintiff further contends even if the Department's resort to facts otherwise available was lawful, the Department's choice of adverse inferences is not supported by substantial evidence on the record and is not otherwise in accordance with law. Plaintiff explains the Department is required to use facts available which are reasonable under the circumstances and may draw an adverse inference only if the interested party "has failed to cooperate by not acting to the best of its ability to comply with a request for information from the administering authority." 19 U.S.C. § 1677e(b) (1994). Plaintiff argues in this case Commerce failed to follow the statute's mandate since the facts

used were not reasonable under the circumstances and since Toyota acted to the best of its ability to comply with a request for information. Plaintiff concludes "[i]n light of evidence demonstrating the existence of the substantial expenses, it was unreasonable and improper for the Department to disallow the entirety of Toyota's home market deduction for these expenses, while using these same expenses to distort and inflate Toyota's [dumping] margin." (Pl.'s Br. at 27–28.)

Based on the statutory language and plaintiff's actions, defendant argues Commerce's determination is supported by substantial evidence on the record and is otherwise in accordance with law. Defendant highlights Commerce's Verification Report, which states "Toyota reported its home market direct advertising and sales promotion expense [ADVERTH] by media and allocated the total expense by sales value", (Def.'s Br. at 19 (quoting Commerce's Verification Report, *reprinted in* Def.'s App. at 56, 73)), and observes when Commerce requested monthly documentation or other records to support these claimed expenses, Toyota officials failed to provide the information in a timely manner. Defendant contends similarly, in the case of Toyota's claimed indirect selling expenses reflecting advertising and sales promotion (INDIRSH), Commerce requested documentation detailing the expenses on a monthly basis but Toyota informed Commerce it could not provide Commerce with the monthly breakdowns for some of Toyota's indirect selling expenses despite Toyota's knowledge that " '[i]t is standard Department practice to review source documentation at a level of detail greater than · a semi-annual report.' " (*Id.* at 17 (quoting *Final Results,* 62 Fed.Reg. at 5,595 (footnote omitted)).)

Defendant additionally adds the record reveals Toyota never disputed it had access to documents more detailed than the semi-annual reports shown to Commerce's verification officials. Defendant concludes because Commerce could not verify the information that it had received and because Toyota failed to cooperate to the best of its ability, Commerce properly applied facts otherwise available and applied an adverse inference pursuant to 19 U.S.C. § 1677e(b) when it

excluded the home market selling expenses from normal value, employed them in the establishment of home market prices as used in the sales-below-cost test and in calculating constructed value, and included the advertising expenses incurred on United States sales in CEP profit. Defendant contends, "Commerce's approach ... is a rational response to Toyota's failure at verification to support its claimed adjustments to normal value for these expenses and to cooperate to the best of its ability." (*Id.* at 18.) Defendant concludes, "because Toyota did not provide the necessary documents to Commerce for verification, Commerce's determination to deny Toyota's claimed ... adjustments for some purposes, but not for others, is reasonable, supported by substantial evidence, and in accordance with law." (*Id.*)

Defendant also argues Commerce's decision to reject Toyota's claimed selling expenses as adjustments to normal value but not for cost, constructed value and CEP profit purposes constitutes a reasonable application of partial, adverse facts available and is not, as Toyota argues, out of proportion to the perceived deficiency at verification. Defendant argues Toyota's argument "overlooks the fact that the total margin analysis involves different calculations that take into account the same claimed expenses" and "Commerce must examine how, for each component of the total margin analysis, a respondent might benefit by failing to provide requested information." (*Id.* at 23.) Defendant argues, as a result, Commerce acted consistently when it denied Toyota's claimed expenses in calculating normal value but included the claimed expenses as an adjustment to sales price in the context of the cost test, and defendant asserts Commerce's treatment of the claimed INDIRSH and ADVERTH variables, while adverse to Toyota's interests, is not punitive.

Defendant–Intervenors argue the statute does not allow the Department to rely on unverified data to calculate dumping margins and "[i]n this case, ... the Department was unable to verify the accuracy of Toyota's claimed adjustments for home market advertising expenses and certain home market in-

direct selling expenses" because "Toyota failed to provide information on the monthly breakdown of these expenses to support its claims for these two adjustments." (Def.-Intvs.' Br. at 14.) Defendant–Intervenors maintain Toyota's contention the Department should have ignored the selling expenses at issue when calculating the cost of production and the constructed value would allow Toyota to benefit from its failure to cooperate and provide the Department with information at verification. Defendant–Intervenors contend the Department reasonably relied on the unverified expenses reported by Toyota to calculate Toyota's costs as accurately as possible and to ensure Toyota would not benefit from failing to provide supporting documentation. Defendant–Intervenors conclude, "[t]he action taken by the Department was therefore not punitive nor duplicative. Rather, the Department included these costs in cost of production and constructed value to ensure that Toyota's costs were not improperly understated." (*Id.* at 17–18.)

Defendant–Intervenors argue this Court's decision in *AK Steel Corp. v. United States,* 988 F.Supp. 594 (CIT 1997), in which the Court examined whether the Department properly relied on best information available (BIA) when it was unable to verify the accuracy of certain information provided by the respondent, supports defendant's position. Defendant–Intervenors assert the respondent in *AK Steel Corp.* argued it had fully complied with the Department's request for information and that the Department's refusal to accept the accuracy of the respondent's data was unreasonable. Defendant–Intervenors explain the Court rejected the respondent's arguments in *AK Steel Corp.,* finding the verification procedure used by the Department was reasonable and the record demonstrated the respondent failed to provide the documentation needed at verification to support its claims. Defendant–Intervenors conclude, "[t]he *AK Steel* case confirms that the Department acted properly in the review underlying this appeal by refusing to rely on information that could not be verified." (Def.-Intvs. Jan. 6, 1998 letter to Court at 2.) [2]

---

**2.** Plaintiff objects to defendant-intervenors' inter-

pretation of the *AK Steel* decision, arguing "the

This Court finds Commerce's denial of Toyota's claimed selling expenses as adjustments to normal value and its use of facts otherwise available with respect to the company's reported home market indirect selling expenses, home market direct advertising expenses, and U.S. direct selling expenses incurred in Japan are not punitive, as plaintiff claims, are supported by substantial evidence on the record and are otherwise in accordance with law. The Court notes Commerce stated, "[t]he verification process was frequently delayed while company officials searched for requested materials and made photocopies.... [C]ompany officials had difficulty collecting ancillary and additional documentation.... As a result of the ... delay in receiving certain documents, there was inadequate time to explore discrepancies found at verification." (Commerce's Verification Report, *reprinted in* Def.-Intvs.' Br. Ex. 6 at 3.) The Court also notes Commerce's further statement that with respect to some of Toyota's claimed direct advertising expenses, it "requested to see monthly details of these expenses and to be provided with documentation or records to support these various claimed expenses" but "[c]ompany officials claimed that they were unable to provide us with this information in a timely manner." (*Id.* at 18.) Commerce also stated with respect to Toyota's claimed indirect selling expenses that it "requested to see monthly details of these expenses and to be provided with documentation or records to support these various claimed expenses" but "company officials informed us that it would take a great deal of time to obtain this information, which included going to a warehouse, and that in any event they could not provide this information before verification was complet-

ed. Department officials could not proceed further with this topic." (*Id.* at 24.) Based on the evidence in the record, the Court finds Commerce's decision to reject Toyota's claimed selling expenses for purposes of calculating normal value, while relying on this information to calculate constructed value and cost of production, is supported by substantial evidence on the record and is otherwise in accordance with law. As Commerce explained "not doing so ... would have rewarded Toyota for its failure to establish the accuracy of these expenses at verification." *Final Results,* 62 Fed.Reg. at 5,594.

## II. *Credit Revenue*

■ Toyota objects to the Department's decision to add an amount to home market sales for credit revenue based on the amount of credit revenue that was added to comparable United States sales. With respect to the Department's decision, pursuant to 19 U.S.C. § 1677e, to impute to Toyota an amount for credit revenue to home market sales as facts otherwise available, Commerce noted

> Toyota reported that it did not earn credit revenue on home market sales. Whether Toyota in fact earned such revenue was a legitimate inquiry for us to pursue at verification. As discussed further below, based on the verification outline, petitioners' pre-verification comments, and our specific requests at verification, Toyota should have been prepared to provide us with TFC's financial statements, a basic source document necessary to explore this issue. By not providing Department officials with the financial statements, Toyota did not provide the Department with the

court should recognize that it does not support defendant-intervenors' position." (Pl.'s Jan. 22, 1998 letter to Court.) Plaintiff contends the case at issue is very different from the *AK Steel Corp.* case and argues

> [i]n the case of the home market credit expense issue, first, plaintiff ... did not fail to present affirmative support for a critical set of data, as did respondent in *AK Steel.* Instead Toyota was unable to produce a specific document (the financial statements of [TFC])that Commerce thought might help prove the negative- the absence of home market credit expense. A failure to verify critical affirmative data is very different from an inability to present a docu-

ment that may or may not prove the absence of one element of the Department's calculation. (*Id.* at 2.) Plaintiff further maintains in *AK Steel Corp.,* Commerce specifically informed respondent the items at issue would be verified, but in the case at issue, Commerce neglected to tell Toyota TFC's financial statements were needed until "the eleventh hour of verification, when it was too late to obtain them." (*Id.* at 3 (footnote omitted).) Plaintiff finally contends the Court in *AK Steel Corp.* found respondent had been given adequate time to provide the documentation while in this case Toyota was given neither time nor notice.

opportunity to ascertain for itself whether the financial statements contained information relevant to our inquiry.

Because Toyota failed to provide us with TFC's financial statements, we have determined that Toyota failed to act to the best of its ability with respect to this issue by withholding information. Therefore, we have relied on an inference that is adverse to the interests of Toyota. Accordingly, as facts available, we applied the transaction-specific gross revenue earned by Toyota Motor Credit Corporation (TMCC) on relevant U.S. sales (revenue without the corresponding offsetting credit expense) to the weighted-average home market price of matched sales.

*Final Results,* 62 Fed.Reg. at 5,596. Commerce explained Toyota could not reasonably claim it had no advance notice the Department would request an examination of TFC's financial statements since the verification outlined clearly indicated this type of document would be subject to review. *See id.* Commerce further maintained, "[g]iven that TFC is a consolidated subsidiary of TMC, Toyota should have made such a document available to Department officials for inspection" especially because "the issue of TFC's involvement in home market transactions has been a recurring one in administrative reviews of this order." *Id.*

Plaintiff argues the Department's resort to facts otherwise available to add credit revenue to home market sales is not supported by substantial evidence on the record and is not otherwise in accordance with law because the Department never requested TFC's financial statements until verification and "it was simply not possible, given the inadequate notice provided, to assemble, and to obtain the necessary clearances to release, these confidential documents." (Pl.'s Br. at 12.)[3] Plaintiff argues Commerce only requested source documents, such as TFC's financial statements, from "companies involved in the sale and distribution of forklift trucks, as identified in [Toyota's] submission", (Verification Outline, *reprinted in* Def.'s App. at 34), and TFC has never been identified as such. Plaintiff further argues, "TFC's financial statements have never been requested in previous verifications, because TFC has never been involved in the production and sale of subject merchandise." (Pl.'s Br. at 9.) Plaintiff explains

> TFC's financial statements were not prepared in advance because there was no request in the verification outline. While TFC's financial statements were requested at verification, they were requested on the penultimate day of verification, giving Toyota less than 36 hours to provide the confidential business information of a separate corporation that had no involvement in the sales at issue.

(*Id.* at 10.) Plaintiff argues, " '[b]efore Commerce may find any noncompliance on the parties to the proceeding, there must be a clear and adequate communication requesting the information ...' ", (*id.* (quoting *Mitsui & Co., Ltd. v. United States,* 18 CIT 185, 203 (1994))), as well as " 'a reasonable and meaningful opportunity' to comply," and in this case, "there was no such clear and adequate communication." (Pl.'s Reply at 3 (quoting *Mitsui & Co., Ltd.,* 18 CIT at 203).) Plaintiff contends it was not put on notice "that TFC's financial statements would be requested, or that, if Toyota did not prepare the financial statements in advance of verification, Commerce would heavily penalize Toyota with adverse adjustments." (*Id.* at 5.)[4]

---

**3.** Plaintiff explains the only reason TFC in Japan became an issue at verification is that Toyota sells its merchandise in the United States through a United States financing arm, Toyota Motor Credit Corporation (TMCC). Because TMCC's involvement resulted in credit revenue for United States sales, petitioner speculated that TFC might provide financing and therefore earn offsetting credit revenue on sales in Japan. Plaintiff explains, "[i]n other words, Petitioners and the Department were inquiring about TFC to determine whether Toyota's claimed adjustment to U.S. price for credit revenue-with no offsetting adjustment for credit revenue in the home market-was justified." (Pl.'s Br. at 13.)

**4.** Plaintiff adds with respect to the Department's inquiry into whether TFC was involved in financing forklift trucks,

> [t]he Department was able to examine thoroughly numerous home market sales, including payment receipts from dealers that would have revealed any TFC involvement, and found no sale in which TFC had any involvement what-

Plaintiff further argues even if Commerce's resort to facts otherwise available as a means of valuing home market credit revenue were lawful, the Department's choice of facts otherwise available was unlawful and the adverse inferences used were disproportionate and excessively punitive. Toyota argues it acted to the best of its ability to comply with the Department's requests for information and contends the information it did provide clearly indicated TFC was not involved in financing sales of subject merchandise in Japan. Plaintiff also argues the Department's resulting adjustments to home market price for supposed credit revenue earned on home market sales is far in excess of any credible or reasonable amount. Plaintiff contends, "[e]ven assuming, therefore, that there was an unjustified failure on the part of Toyota to provide information on TFC-which there was not-the most severe consequence should be to neutralize any favorable impact of the U.S. credit revenue." (Pl.'s Br. at 13.) [5] Plaintiff concludes, "the Department hit Toyota with a very punitive adjustment to normal value. This punitive amount is entirely out of proportion both to Toyota's 'failure' to provide the requested document, and to the relatively minor net credit revenue reported for U.S. sales." (Id. at 16.)

Defendant contends four factors support its argument Toyota "could not have been surprised, and should have been prepared, to produce TFC's financial statements upon Commerce's request." (Def.'s Br. at 26.) The four factors defendant cites are: (1). Commerce specifically inquired about TFC in its pre-verification questionnaires; (2).

petitioners repeatedly encouraged the Department to focus on Toyota's home-market forklift sales financing arrangements; (3). Commerce's verification agenda instructed Toyota to be prepared to produce affiliated-party financial statements; and (4). Toyota's home market credit revenues were an issue in the second administrative review covering 1989–90. (See id.) Defendant explains Toyota indicated only that TFC was not involved in any financing transactions between Toyota Automatic Loomworks, Ltd. (TAL) or TMC and its affiliated and unaffiliated dealers, but did not explain the discrepancy between Toyota's voluminous sales in Japan during the period of review and Toyota's claim that despite TFC's substantial credit revenues, it was not involved in financing forklift truck sales in Japan. Defendant concludes, "where, as here, petitioners consistently endeavor to focus Commerce's attention upon a valid line of inquiry, respondents cannot claim lack of notice when Commerce probes more deeply into the area of inquiry at verification." (Id. at 28.) Defendant maintains Toyota's failure "precluded Commerce from ascertaining what, if any, financing arrangements Toyota had provided its domestic forklift customers during the POR", (id. at 25), and, as a result, Commerce properly applied the transaction-specific gross revenue earned by Toyota Motor Credit Corporation on relevant United States sales to the weighted-average home market price of matched sales.

Defendant additionally argues the statute's mandate allowing Commerce to employ an adverse inference when, as here, "an inter-

soever. Indeed, not once, during an entire week of examining sales documentation, did TFC come up as being involved in any way in the transactions at issue. The Department was able to interview TFC officials, who confirmed this fact, and was able to examine certain TFC documentation. The one document that Toyota was not able to provide on the short notice allowed was TFC's financial statements, which, like all of the other documents examined by Commerce, would have contained no mention of forklift truck financing.
(Pl.'s Reply at 7–8 (internal citations and footnote omitted).)

**5.** In response to plaintiff's claim the Department's choice and use of facts otherwise avail-

able were unlawful because the amount of the adjustment claimed was in excess of any credit or reasonable amount and the only steps the Department should have taken would have been to "neutralize" any favorable impact of U.S. credit revenue, defendant-intervenors cite the Department's *Final Results*, which state the Department's purpose "is not to neutralize the benefit Toyota obtained on financing certain U.S. sales, but rather is a response to Toyota's failure to comply with a specific request to produce a document that would permit [the Department] to ascertain whether TFC was involved in home market transactions." (Def.-Intvs.' Br. 22 (quoting *Final Results*, 62 Fed.Reg. at 5,596).)

ested party has failed to cooperate by not acting to the best of its ability to comply with a request for information", 19 U.S.C. § 1677e(b), permits Commerce to apply an adverse inference with respect to this issue. Defendant contends Toyota did not cooperate to the best of its ability due to its general lack of preparedness at verification, as well as its failure to provide Commerce with sufficient information about TFC, specifically TFC's financial statements, to confirm Toyota's claim that TFC had no involvement in the financing of home-market forklift truck sales.

Defendant–Intervenors respond to Toyota's claims by arguing "[w]hile Toyota again attempts to recharacterize its own actions by claiming that it fully 'cooperated' with the Department, Toyota's contention that TFC's financial statements 'were not prepared in advance' and were therefore not available again points to Toyota's efforts to control the verification." (Def.-Intvs.' Br. at 21 (citing Pl.'s Br. at 10).) Defendant–Intervenors maintain one of the purposes of verification is to review supporting financial documents that the respondent should have available but will not have "prepared" for purposes of verification. Defendant–Intervenors also contend even though Toyota failed to provide supporting documentation, the Department did not reject Toyota's response in its entirety nor did it apply the most adverse facts available, for example, by adding the highest credit revenue earned on any U.S. sale to each home market sale. Defendant–Intervenors contend, "[r]ather, the Department simply applied the same credit revenue from the comparable U.S. sale to the home market sale." (Id. at 10.) Defendant Intervenors additionally argue although Toyota suggests the Department made an adjustment for credit revenue in the home market without making a corresponding adjustment for credit expense, "the record clearly shows that the Department did make an adjustment for credit expenses based on Toyota's reported claim for this expense." (Id.)

This Court finds Commerce's determination to impute to Toyota home market credit revenue as adverse facts otherwise available based upon Toyota's failure at verification to produce the requested financial statements of an affiliated entity is supported by substantial evidence on the record and is otherwise in accordance with law. The Court acknowledges plaintiff's argument that

> Commerce's verification outline did not request that Toyota present or prepare to submit the TFC financial statements at verification. The "Summary of Required Source Documents," which the Government attempts to equate to a "clear and adequate" request for TFC's financial statements, is an "illustrative list of the type of source documents to be examined during verification." It is a definition of "source documents," not a request for financial statements of particular Toyota entities

(Pl.'s Reply at 5 (citations omitted)). The Court also acknowledges plaintiff's assertion "[t]he Department gave no warning that it would require [TFC's financial statements]", (id. at 8), but finds evidence on the record clearly indicates Toyota should have anticipated Commerce would request TFC's financial statements at verification. The Court further notes Commerce stated, "[a]t verification we requested company officials to provide us with financial statements of [TFC] and to establish that TFC is not involved in the home market transactions between TMC and its affiliated and unaffiliated dealers" but "[c]ompany officials were unable to provide us with TFC's financial statements nor any other documentation to show the breakout of activities engaged in by TFC." (Aug. 2, 1998 Mem. Re. Admin. Rev. at 10, 11, reprinted in Def.-Intvs.' Br. Ex. 6.) The Court believes Commerce reasonably inferred from information Toyota provided in its original questionnaire response that TFC might have a role in financing home market forklift truck sales.[6]

6.  In its original questionnaire response at section A, Toyota reported that

Business in financial services is our biggest source of revenues by far in diversified operations. That business consists primarily of financing for Toyota dealers and their customers in markets around the world.

We provide financing for dealers and customers through finance companies in Japan. . . .

The Court does not agree with plaintiff's argument "there is no evidence that the financial statements requested by the Department would have contained any information which would have been necessary to an accurate determination", (Pl.'s Br. at 11 (citation omitted)), or that "[a]ll necessary information to properly resolve the issue of TFC's non-involvement with the production and sale of subject merchandise is on the record." (*Id.* at 20.)

The Court notes plaintiff cites *Final Determination of Sales at Less Than Fair Value: Certain Pasta From Italy,* 61 Fed.Reg. 30,-326, 30,329 (Dep't Comm.1996) for the proposition "[b]ecause [respondent] made some effort to cooperate, even though it did not cooperate to the best of its ability, we did not chose the most adverse rate based on the petition", (Pl.'s Br. at 19), and finds in this case, as defendant points out, Commerce did not apply the most stringent adverse inference that could have been imposed, embodying Commerce's recognition that Toyota failed to cooperate to the best of its ability only with respect to certain types of information. This Court previously stated, "a party cannot control the results of the administrative process via its own unresponsiveness." *Mitsuboshi Belting Ltd. v. United States,* No. 93–09–00640, 1997 WL 118397, at *3 (CIT Mar. 12, 1997) (citing *Pistachio Group of the Ass'n of Food Indus., Inc. v. United States,* 11 CIT 668, 679, 671 F.Supp. 31, 40 (1987)). As a result, the Court holds Toyota

did not cooperate to the best of its ability to comply with Commerce's requests for information and finds Commerce acted properly pursuant to 19 U.S.C. § 1677e(b) when it employed an adverse inference with respect to this issue. The Court further finds Commerce's choice of facts otherwise available is supported by substantial evidence on the record and is otherwise in accordance with law and upholds Commerce's determination to impute, as adverse, partial facts available, the gross credit revenues earned on Toyota's U.S. sales to comparison home-market sales.

### III. *Constructed Export Price Profit*

■ Toyota also objects to the Department's calculation of a single, aggregated CEP profit from sales of Toyota's small and large forklift trucks [7] based on the Department's treatment of the trucks as a single "foreign like product." [8] In the *Final Results,* the Department stated with respect to its calculation of CEP profit

> In accordance with our practice as described in the *Proposed Regulations* (at 7382), we have used the aggregate of expenses and profit for all subject merchandise sold in the United States and all foreign like products sold in the exporting country. During the POR, Toyota sold both small and large trucks in the United States. While only a small quantity of small trucks were sold in the United States, home market sales of trucks of

(Toyota's Principal Questionnaire Response, *reprinted in* Def.'s App. at 100.)

**7.** Defendant indicates " 'small' refers to those forklift trucks with load capacity ranges from 2,000 to 3,000 pounds, 3,001 to 5,000 pounds, and 5,001 to 6,999 pounds," ranges which defendant explains "correspond to categories one through three in Commerce's questionnaire." (Def.'s Br. at 34 n. 6.) Defendant explains, " '[l]arge' forklift trucks, by contrast are those with load capacity ranges from 7,000 to 10,000 pounds, and from 10,001 to 15,000 pounds," ranges which defendant explains "correspond with categories four and five in Commerce's questionnaire." (*Id.* at 34–35.)

**8.** "Foreign like product" is defined, in relevant part, as

(A) The subject merchandise and other merchandise which is identical in physical charac-

teristics with, and was produced in the same country by the same person as, that merchandise.
(B) Merchandise-
 (i) produced in the same country and by the same person as the subject merchandise,
 (ii) like that merchandise in component material or materials and in the purposes for which used, and
 (iii) approximately equal in commercial value to that merchandise.
(C) Merchandise-
 (i) produced in the same country and by the same person and of the same general class or kind as the merchandise which is the subject of the investigation,
 (ii) like that merchandise in the purposes for which used, and
 (iii) which the administering authority determines may reasonably be compared with that merchandise.
19 U.S.C. § 1677(16) (1994).

these categories are nonetheless potential matches. . . .

The statute does not require separate CEP-profit calculation based on the narrow interpretation of the term "foreign like product" advanced by Toyota. . . . "[N]either the statute nor the SAA [Statement of Administrative Action] require us to calculate CEP profit on a basis more specific than the subject merchandise as a whole. . . . [T]he statute and SAA, by referring to 'the' profit, 'total actual profit' and 'total actual expenses,' imply that we should prefer calculating a single profit figure."

*Final Results,* 62 Fed.Reg. at 5,599 (quoting *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Singapore and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews,* 62 Fed.Reg. 2,081, 2,125 (Dep't Comm.1997)). The statute provides

(d) Additional adjustments to constructed export price

For purposes of this section, the price used to establish constructed export price shall also be reduced by—

(1) the amount of any of the following expenses generally incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise (or subject merchandise to which value has been added)—

. . . .

(2) the cost of any further manufacture or assembly (including additional material and labor), except in circumstances described in subsection (e) of this section; and

(3) *the profit* allocated to the expenses described in paragraphs (1) and (2).

19 U.S.C. § 1677a(d) (1994) (emphasis added). The statute also provides:

(f) Special rule for determining profit

(1) In general

For purposes of subsection (d)(3) of this section, profit shall be an amount determined by multiplying the total actual profit by the applicable percentage.

(2) Definitions

For purposes of this subsection:

. . . .

(C) Total Expenses

The term "total expenses" means all expenses in the first of the following categories which applies and which are incurred by or on behalf of the foreign producer and foreign exporter of the subject merchandise and by or on behalf of the United States seller affiliated with the producer or exporter with respect to the production and sale of such merchandise:

(i) The expenses incurred with respect to the subject merchandise sold in the United States and the foreign like product sold in the exporting country if such expenses were requested by the administering authority for the purpose of establishing normal value and constructed export price.

(ii) The expenses incurred with respect to the narrowest category of merchandise sold in the United States and the exporting country which includes the subject merchandise.

(iii) The expenses incurred with respect to the narrowest category of merchandise sold in all countries which includes the subject merchandise.

(D) Total actual profit

The term "total actual profit" means the total profit earned by the foreign producer, exporter, and affiliated parties described in subparagraph (C) with respect to the sale of the same merchandise for which total expenses are determined under such subparagraph.

19 U.S.C. § 1677a(f) (1994).

Plaintiff argues CEP profit is calculated with respect to the "foreign like product" and "if there are two separate foreign like products, there have to be two separate CEP calculations. In this case, plaintiff argues, there must be a separate CEP profit calculation for large and small trucks." (Pl.'s Reply at 15.) Plaintiff argues the statute requires "that the CEP profit be an average of (1) the profit on the subject merchandise sold in the

United States and (2) the home market merchandise that can be 'satisfactorily' used as normal value for that subject merchandise," (Pl.'s Br. at 29), which Commerce disregarded in the *Final Results* "when it used the profit on small forklifts in Japan to calculate the CEP profit for large forklifts in the United States." (*Id.*)

Plaintiff argues, "where the Department has in effect determined that there are several foreign like products ... there must be several calculations of CEP profit, each based on the profit of the U.S. sales and the home market sales in that category." (*Id.* at 31.) Plaintiff further contends Commerce defined two foreign like products categories for the large trucks and three categories of small forklifts, which "could not legally serve as normal value for any of the large-capacity forklift trucks." (*Id.* at 32.) Plaintiff argues Commerce's approach is "highly distortive because Toyota's profit on small trucks is much higher than its profit on large trucks, and there are many more sales of small trucks than of large trucks. The result of this illegal calculation, therefore, is a significant overstatement of CEP profit." (*Id.* at 30.) Plaintiff maintains

> If there is a category of home market sales (*e.g.,* small forklift trucks), which the Department itself has determined *cannot* satisfactorily serve as normal value for another category of U.S. sales (*e.g.,* large forklift trucks), then the small forklift trucks are not, by statutory definition, the "foreign like product" to the large trucks. Therefore, the CEP profit for the large trucks cannot be based on the profit of the small trucks, which are not a foreign like product vis-a-vis the large trucks.

(*Id.* at 32–33.)

Plaintiff additionally argues the Department's justifications for calculating a single CEP profit rate in this review are without merit. Plaintiff contends defendant's claim the statutory references to "total" actual profit, "total" U.S. expenses and "total" expense "can just as easily refer to a separate 'total' for each foreign like product as it can to a single 'total' for all foreign like products grouped together." (Pl.'s Reply at 15.) Plaintiff contends although small home market trucks were potential matches for small U.S. forklift trucks, "they were not potential matches for any of the large trucks. Therefore, their profit should not have been allocated to the large trucks." (Pl.'s Br. at 37.) Plaintiff additionally maintains, "it makes no sense to inflate the CEP profit" of large forklift trucks "solely because of the sale of a *de minimis* number of small trucks in the U.S. market." (*Id.*) Plaintiff also argues the statute requires Commerce to

> calculate as many normal values and constructed export prices as there are products, despite the use of the singular number and the word 'the'. Similarly, the use of the singular number and the word 'the' in connection with CEP profit says nothing whatsoever about whether there should be one or many profit figures.

(*Id.*) Finally, plaintiff argues, "[f]ollowing the statute's mandate to calculate CEP profit based on the profit of the U.S. sales and their foreign like product does not make it easier to manipulate the profit rates." (*Id.* at 39.) Plaintiff concludes

> it is hard to imagine a case where a separate calculation of CEP profit for each foreign like product is more compelling.
>
> . . . .
>
> [The statute] states that the CEP profit should be calculated "with respect to the subject merchandise sold in the United States and the foreign like product"-that is, the foreign product most similar to the subject merchandise sold in the United States "sold in the exporting country". [The statute] does not say that the profit should be calculated with respect to *all* foreign merchandise, and it does not say that profit should be calculated with respect to the subject merchandise that *could* have been sold in the United States and the foreign like product to those possible U.S. sales. [The statute] states that the profit should be calculated with respect to the subject merchandise *actually sold* in the United States and *its* foreign like product.
>
> Since "the subject merchandise sold in the United States" consists of 7,000 lb.–10,000 lb. and 10,001 lb.–15,000 lb. forklifts, the "foreign like product" for which profit

should be calculated should be either (1) the home market forklift trucks selected as *the* such or similar (now "foreign like product") merchandise in the concordance listing; or, at most, (2) the home market products in the "foreign like product" categories, defined by the Department in its questionnaire, that correspond to the 7,000 lb.–10,000 lb. and 10,001 lb.–15,000 lb. forklifts sold in the United States.

(*Id.* at 39–40.)

Defendant argues, "Commerce's determination to calculate a single CEP profit based upon all subject merchandise and foreign like product forklift trucks is a reasonable interpretation of the statute, supported by substantial evidence, and is otherwise in accordance with law." (Def.'s Br. at 34 (footnote omitted).) Defendant contends the CEP profit calculation involves two steps: first, "pursuant to [19 U.S.C. § ] 1677a(f), Commerce calculates a 'total actual profit' based upon 'all sales of the subject merchandise and the foreign like product' "; second, "pursuant to [19 U.S.C. § ] 1677a(d)(3), Commerce *allocates* this figure to individual CEP transactions as adjusted by [19 U.S.C. §§ ] 1677a(d)(1) and (2)." (*Id.* at 35 (quoting Import Administration Policy Bulletin 97–1, *reprinted in* Def.'s App. at 87).) Defendant maintains Toyota's small and large forklift trucks constitute a single "foreign like product" for purposes of calculating CEP profit in accordance with the plain meaning of the statute.

Defendant argues the statute does not state that

"total actual profit" and "total expenses" indicate that Commerce must subdivide the foreign like product in order to perform multiple CEP calculations. Indeed, according to [19 U.S.C. § ] 1677a(f)(2)(C), the basis upon which CEP profit is to be calculated is *all* subject merchandise sold in the United States and *all* foreign like product sold abroad.

(*Id.* at 38 (footnote omitted).) Defendant further contends the statute's definition of "foreign like product" in 19 U.S.C. § 1677(16) "adds nothing in support of Toyota's argument that Commerce must calculate separate CEP profits for the separate forklift load-

capacity categories" and "Toyota's proposed narrow construction of 'foreign like product' finds no support in ... legislative history." (*Id.* at 38, 39.)

Defendant argues Commerce's position regarding "foreign like product" in this case is consistent with previous determinations. (*See id.* at 40 (citing *Notice of Final Determination of Sales at Less Than Fair Value: Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Japan,* 61 Fed.Reg. 38,-139, 38,146 (Dep't Comm.1996)) (*LNPP From Japan* )). In that investigation, Commerce disagreed with respondent's assertion there had been no sales of the foreign like product in Japan. Commerce determined even though it did not find home market sales which provided "practicable price-to-price matches," respondent was incorrect to argue no foreign like product existed. *See* ·*LNPP From Japan,* 61 Fed.Reg. at 38,144. Defendant argues Commerce similarly noted in this case " '[w]hile only a small quantity of small trucks were sold in the United States, home market trucks of these categories are nonetheless potential matches. Accordingly, the foreign like product in this review encompasses both small and large trucks.' " (Def.'s Br. at 41 (quoting *Final Results,* 62 Fed.Reg. at 5,599).)

Defendant additionally argues, "[t]he narrow construction of the CEP-profit provisions advanced by Toyota conflicts with at least one other section of the antidumping statute." (*Id.*) Defendant explains Toyota's argument for multiple foreign like products would "undermine Commerce's ability to conduct a unified home market viability analysis" in that "Toyota's approach could lead to a finding of viability with respect to some load-capacity categories of forklifts, but not with respect to others" which "would potentially require Commerce to base normal value both upon home-market and third-country sales in the same investigation or administrative review, and would add unnecessary complexity to Commerce's administration of the antidumping law." (*Id.* at 41–42.)

Defendant further argues Commerce's determination to treat Toyota's small and large forklifts as one foreign like product for CEP

profit calculation purposes is consistent with agency precedent. *(See id.* at 42–44 (citing *Color Picture Tubes From Japan; Final Results of Antidumping Administrative* Review, 62 Fed.Reg. 34,201, 34,212 (Dep't Comm.1997) (Commerce rejected a narrow construction of foreign like product for CEP profit purposes and stated, "our calculation of CV and CEP profits should include all home market sales during the POR of the foreign like product")); *Professional Electric Cutting Tools From Japan; Final Results of Antidumping Duty Administrative Review,* 62 Fed.Reg. 386, 390 (Dep't Comm.1997) (Contrary to petitioners' argument 19 U.S.C. § 1677(16) required Commerce to calculate constructed value and CEP profit using only the home market sales which could be matched most closely to the subject merchandise, Commerce employed a broader reading of "foreign like product" and stated "[f]or purposes of calculating CV and CEP profit, we interpret the term 'foreign like product' to be inclusive of all merchandise sold in the home market which is in the same general class or kind of merchandise as that under consideration"); *LNPP From Japan,* 61 Fed.Reg. at 38,146 (Dep't Comm.1996) (Commerce disagreed with respondent's argument that differences in the Japanese-market large newspaper printing presses rendered them useless as a basis for normal value, and they could therefore not be considered as a foreign like product within the meaning of 19 U.S.C. § 1677(16) and held while "the degree of unique customization for customers" complicated price-matching such that constructed value proved more reliable and administrable, LNPP equipment sold in Japan did constitute the foreign like product under 19 U.S.C. § 1677(16)).)

Defendant also maintains Commerce has consistently used a single, all-inclusive foreign like product in calculating CEP profits in accordance with its regulations. Defendant explains Commerce proposed section 351.402(d)(1) to implement 19 U.S.C. § 1677a(f), entitled "Special rule for determining profit," which sets forth Commerce's understanding that a reasonable interpretation of the statute assigns "foreign like product" a broad meaning. The proposed rule states:

In calculating total expenses and total actual profit, the Secretary normally will use the aggregate of expenses and profit for all subject merchandise sold in the United States and all foreign like products sold in the exporting country, including sales that have been disregarded as being below the cost of production.

*Proposed Rules, Antidumping Duties; Countervailing Duties,* 61 Fed.Reg. 7,308, 7,382 (Dep't Comm.1996). Defendant concludes

[g]iven [Commerce's] consistent and reasonable statements of [its] implementation of the new CEP-profit requirement, this Court should uphold Commerce's construction of 19 U.S.C. §§ 1677(16), 1677a(d)(3) and (f) and Commerce's determination, in this administrative review, to assign Toyota a single, aggregated CEP profit based on all foreign like products, *i.e.,* forklift trucks.

(Def.'s Br. at 46.)

Defendant additionally points out Commerce's policy of calculating a single, aggregated CEP profit from sales of Toyota's small and large forklift trucks in the two markets also addresses Congress' concern that a respondent could manipulate CEP profit and dumping margins by shifting profit allocations to certain subcategories of the subject merchandise. Defendant argues,

Congress' concern regarding the manipulability of CEP profit by respondents is particularly significant when considering Toyota's contention that small trucks "were not potential matches for any of the large trucks," and that "their profit should not have been allocated to the large trucks." If this is so, then Toyota must also recognize that the lines separating product categories within which CEP profit is calculated could be drawn in a great variety of places.... Were Commerce to accede to Toyota's proposal, it is easy to imagine the CEP profit calculation devolving into a mathematical contest in which petitioners and respondents subdivide the universe of the subject merchandise depending upon the effect of each profit allocation on the dumping margin. Where, as

here, the subject merchandise is complex machinery, the CEP profit exercise would become all the more difficult.

(*Id.* at 47–48 (citation omitted).)

In response to plaintiff's characterization of the Department's calculations as using "'the profit on small forklifts in Japan to calculate the CEP profit for large forklifts in the United States,'" defendant-intervenors argue, "[i]n fact, the Department calculated a single CEP profit that was applied to *all* sales of forklift trucks (both large and small) in the United States based on the profit on home market sales and U.S. sales of both large and small forklift trucks." (Def.-Intvs.' Br. at 24 (quoting Pl.'s Br. at 29).) Defendant–Intervenors also disagree with plaintiff's argument the statute requires the Department to calculate CEP profit based on individual foreign like product categories and contend the statute only refers to "'the'" profit and "[t]he other provisions dictating the Department's methodology for calculating the profit similarly do not specify that profit must be calculated on 'any basis more specific than [sic] the subject merchandise as a whole.'" (*Id.* (quoting *Final Results,* 62 Fed.Reg. at 5,599).) Defendant–Intervenors further argue, "[i]n this and other cases, the Department has determined that the statutory references to 'the profit' indicate the Department 'should prefer calculating a single profit figure.'" (*Id.* at 24–25 (citation omitted).) Defendant–Intervenors conclude, "[w]hen the statute is read in conjunction with the SAA and legislative history, and express congressional concern over the potential for manipulation, the Department reasonably determined that the statutory preference is a single CEP profit for all sales under consideration." (*Id.* at 25.)

This Court finds Commerce's use of a single, aggregated CEP profit from sales of Toyota's large and small forklift trucks is based on a reasonable interpretation of the statutory language, is supported by substantial evidence on the record and is otherwise in accordance with law. *Chevron* states when "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute," *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778 (footnote omitted), and this Court must accord substantial weight to the agency's interpretation of the statute it administers. *See American Lamb,* 785 F.2d 994, 4 Fed. Cir. (T) at 54. The Court notes defendant-intervenors' argument the statute does not explicitly require the Department to base CEP profit from sales of individual foreign like product categories and agrees with defendant-intervenors' argument if Congress had intended for the Department to be required to calculate profit on this basis, such a requirement could easily have been incorporated into the statute. No such requirement exists.

This Court additionally notes the statute instructs Commerce that, for the purposes of adjusting CEP profit, the "profit shall be *an amount* determined by multiplying the *total actual profit* by the applicable percentage." 19 U.S.C. § 1677a(f)(1) (1994). The Court finds persuasive defendant's argument the language of the statute requires Commerce to calculate a single figure that is to be allocated across the CEP profit deductions mandated by 19 U.S.C. §§ 1677a(d)(1) and (2). The Court finds Commerce's interpretation it should calculate only one CEP profit is supported by substantial evidence on the record and is otherwise in accordance with law. The Court upholds Commerce's construction of 19 U.S.C. §§ 1677a(d)(3) and (f) and its determination to assign Toyota a single, aggregated CEP profit from sales of all subject merchandise and foreign like forklift trucks.

### CONCLUSION

For the reasons discussed above, this Court denies Plaintiff's Motion for Judgment Upon the Agency Record and sustains Commerce's *Final Results* in their entirety. Accordingly, the Court dismisses this action.

### JUDGMENT ORDER

Upon due consideration of the motion submitted by plaintiff and the opposition thereto, and upon all of the papers submitted herein by the parties and upon due deliberation, it is hereby

**ORDERED** that Plaintiff's Motion for Judgment on the Agency Record is denied; and it is further

**ORDERED** that Commerce's determination in *Certain Internal–Combustion Forklift Trucks from Japan; Final Results of Antidumping Administrative Review*, 62 Fed. Reg. 5,592 (Dep't.Comm.1997) is sustained in its entirety; and it is further

**ORDERED** that this action is dismissed.