# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

```
_____
                                       :
RHP BEARINGS LTD., NSK BEARINGS        :
EUROPE LTD. and NSK CORPORATION,       :
                                       :
                 Plaintiffs,           :
                                       :
        v.                             :   Consol. Court No.
                                       :   97-02-00217
UNITED STATES,                         :
                                       :
                 Defendant,            :
                                       :
THE TORRINGTON COMPANY,                :
                                       :
        Defendant-Intervenor.          :
_____:
```

Plaintiffs, RHP Bearings Ltd., NSK Bearings Europe Ltd. and NSK Corporation (collectively, "RHP-NSK"), move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging various aspects of the Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Singapore, and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews ("Final Results"), 62 Fed. Reg. 2081 (Jan. 15, 1997), as amended, Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof from Germany: Amended Final Results of Antidumping Administrative Review, 62 Fed. Reg. 2130 (Jan. 15, 1997), and Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, and Singapore; Amended Final Results of Antidumping Duty Administrative Reviews, 62 Fed. Reg. 14,391 (Mar. 26, 1997).

Specifically, RHP-NSK claims that Commerce erred in: (1) using aggregate data that encompasses all foreign like products under consideration for normal value for calculating constructed value ("CV") profit under 19 U.S.C. § 1677b(e)(2)(A) (1994); (2) including sample transactions that were not supported by consideration in RHP-NSK's United States sales database; and (3)

excluding imputed inventory carrying costs in the constructed export price ("CEP") offset for RHP-NSK when Commerce matched CEP sales to CV.

Torrington responds that: (1) Commerce reasonably calculated profit for CV on the basis of the statutory preferred method of 19 U.S.C. § 1677b(e)(2)(A); (2) RHP-NSK failed to prove that the sample transactions in question were without consideration or, if a remand is ordered, Commerce should determine whether RHP-NSK's sample transactions are in fact without consideration; and (3) Commerce should not include imputed inventory carrying costs when comparing CEP sales to CV or, if a remand is ordered, any deduction of such costs should be capped not to exceed actual expenses.

**Held:** RHP-NSK's motion is denied in part and granted in part. The case is remanded to Commerce to: (1) exclude from RHP-NSK's United States sales database any sample transactions that were not supported by consideration and to adjust the dumping margins accordingly; and (2) include imputed inventory carrying costs in the calculation of CEP offset for RHP-NSK when matching CEP sales to CV.

[RHP-NSK's motion is denied in part and granted in part. Case remanded.]

Dated: December 16, 1999

Lipstein, Jaffe & Lawson, L.L.P. (Robert A. Lipstein, Matthew P. Jaffe and Grace W. Lawson) for plaintiffs.

David W. Ogden, Acting Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Velta A. Melnbrencis, Assistant Director); of counsel: Mark A. Barnett, Patrick V. Gallagher and David R. Mason, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for defendant.

Stewart and Stewart (Terence P. Stewart, James R. Cannon, Jr., Wesley K. Caine, Geert De Prest and Lane S. Hurewitz) for defendant-intervenor.

## OPINION

**TSOUCALAS, Senior Judge:** Plaintiffs, RHP Bearings Ltd., NSK Bearings Europe Ltd. and NSK Corporation (collectively, "RHP-NSK"), move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging various aspects of the Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Singapore, and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews ("Final Results"), 62 Fed. Reg. 2081 (Jan. 15, 1997), as amended, Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof from Germany: Amended Final Results of Antidumping Administrative Review, 62 Fed. Reg. 2130 (Jan. 15, 1997), and Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, and Singapore; Amended Final Results of Antidumping Duty Administrative Reviews, 62 Fed. Reg. 14,391 (Mar. 26, 1997).

Specifically, RHP-NSK claims that Commerce erred in: (1) using aggregate data that encompasses all foreign like products under consideration for normal value ("NV") for calculating constructed value ("CV") profit under 19 U.S.C. § 1677b(e)(2)(A)

(1994); (2) including in RHP-NSK's United States sales database any sample transactions that were not supported by consideration; and (3) excluding imputed inventory carrying costs in the constructed export price ("CEP") offset for RHP-NSK when it matched CEP sales to CV.

Torrington responds that: (1) Commerce reasonably calculated profit for CV on the basis of the statutory preferred method of 19 U.S.C. § 1677b(e)(2)(A); (2) RHP-NSK failed to prove that the sample transactions in question were without consideration or, if a remand is ordered, Commerce should determine whether RHP-NSK's sample transactions are in fact without consideration; and (3) Commerce should not include imputed inventory carrying costs when comparing CEP sales to CV or, if a remand is ordered, any deduction of such costs should be capped not to exceed actual expenses.

The Court will address each of these arguments in turn.

## BACKGROUND

This case concerns the sixth administrative review of the antidumping duty order on antifriction bearings (other than tapered roller bearings) and parts thereof ("AFBs") imported

from the United Kingdom during the review period of May 1, 1994

through April 30, 1995.[1]  Commerce published the preliminary

results of the subject review on July 8, 1996.  See Antifriction

Bearings (Other Than Tapered Roller Bearings) and Parts Thereof

from France, Germany, Italy, Japan, Romania, Singapore, Thailand

and the United Kingdom; Preliminary Results of Antidumping Duty

Administrative Reviews, Termination of Administrative Reviews,

and Partial Termination of Administrative Reviews ("Preliminary

Results"), 61 Fed. Reg. 35,713.  On January 15, 1997, Commerce

published the Finals Results at issue here.  See 62 Fed. Reg. at

2081.


                          **JURISDICTION**

     The Court has jurisdiction over this matter pursuant to 19

U.S.C. § 1516a(a) (1994) and 28 U.S.C. § 1581(c) (1994).


                       **STANDARD OF REVIEW**

     The Court will uphold Commerce's final determination in an

---

     [1]  Since the administrative review at issue was initiated
after December 31, 1994, the applicable law in this case is the
antidumping statute as amended by the Uruguay Round Agreements
Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994) (effective Jan.
1, 1995) ("URAA").  See Torrington Co. v. United States, 68 F.3d
1347, 1352 (Fed. Cir. 1995) (citing URAA § 291(a)(2), (b)
(noting effective date of URAA amendments)).

administrative review unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i) (1994).

I.      Substantial Evidence Test

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966) (citations omitted).  Moreover, "[t]he court may not substitute its judgment for that of the [agency] when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'"  American Spring Wire Corp. v. United States, 8 CIT 20, 22, 590 F. Supp. 1273, 1276 (1984) (quoting Penntech Papers, Inc. v. NLRB, 706 F.2d 18, 22-23 (1st Cir.

1983) (quoting, in turn, <u>Universal Camera</u>, 340 U.S. at 488)).


II.    <u>Chevron</u> Two-Step Analysis

To determine whether Commerce's interpretation and application of the antidumping statute is "in accordance with law," the Court must undertake the two-step analysis prescribed by <u>Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837 (1984).  Under the first step, the Court reviews Commerce's construction of a statutory provision to determine whether "Congress has directly spoken to the precise question at issue."  <u>Id.</u> at 842.  "To ascertain whether Congress had an intention on the precise question at issue, [the Court] employ[s] the 'traditional tools of statutory construction.'" <u>Timex V.I., Inc. v. United States</u>, 157 F.3d 879, 882 (Fed. Cir. 1998) (citing <u>Chevron</u>, 467 U.S. at 843 n.9).  "The first and foremost 'tool' is the statute's text, giving it its plain meaning.  Because a statute's text is Congress's final expression of its intent, if the text answers the question, that is the end of the matter."  <u>Id.</u> (citations omitted).  Beyond the statute's text, the tools of statutory construction "include the statute's structure, canons of statutory construction, and legislative history."  <u>Id.</u> (citations omitted); <u>but see</u> <u>Flora</u>

Trade Council v. United States, 23 CIT __, 41 F. Supp. 2d 319, 323 n.6 (1999) (noting that "[n]ot all rules of statutory construction rise to the level of a canon, however") (citation omitted).

If, after employing the first prong of Chevron, the Court determines that the statute is silent or ambiguous with respect to the specific issue, the question for the Court becomes whether Commerce's construction of the statute is permissible. Chevron, 467 U.S. at 843. Essentially, this is an inquiry into the reasonableness of Commerce's interpretation. See Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1038 (Fed. Cir. 1996). Provided Commerce has acted rationally, the Court may not substitute its judgment for the agency's. See IPSCO, Inc. v. United States, 965 F.2d 1056, 1061 (Fed. Cir. 1992); see also Koyo Seiko Co. v. United States, 36 F.3d 1565, 1570 (Fed. Cir. 1994) (holding that "a court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another"). The "[C]ourt will sustain the determination if it is reasonable and supported by the record as a whole, including whatever fairly detracts from the substantiality of the evidence." Negev Phosphates, Ltd. v. United States Dep't of Commerce, 12 CIT 1074, 1077, 699 F. Supp.

938, 942 (1988) (citations omitted). "In determining whether Commerce's interpretation is reasonable, the Court considers, among other factors, the express terms of the provisions at issue, the objectives of those provisions and the objectives of the antidumping scheme as a whole." <u>Mitsubishi Heavy Indus., Ltd. v. United States</u>, 22 CIT __, __, 15 F. Supp. 2d 807, 813 (1998)).

## DISCUSSION

I. **Calculation of Profit for Constructed Value**

    A. **Statutory and Factual Background**

An antidumping duty is imposed upon imported merchandise when (1) Commerce determines such merchandise is sold or likely to be sold in the United States at less than fair value ("LTFV," <u>i.e.</u>, at a price which is lower than the price at which the merchandise is sold in the country of exportation or to a third country), and (2) the International Trade Commission determines that domestic industry is materially injured or threatened with material injury, or the establishment of an industry in the United States is materially retarded, by reason of imports of the subject merchandise or by reason of the LTFV sales or likelihood of LTFV sales of that merchandise for importation.

See 19 U.S.C. § 1673 (1994).  In calculating the antidumping duty, Commerce compares the price of the imported merchandise in the United States (i.e., export price ("EP") or CEP)[2] to its NV. See id.  The dumping margin is "the amount by which the [NV] exceeds the [EP] or [CEP] of the subject merchandise."  19 U.S.C. § 1677(35) (1994).

NV is the comparable price for a product like the imported merchandise when first sold (generally, to unaffiliated parties) "for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price."  19 U.S.C. § 1677b(a)(1)(B)(i) (1994).  Where home market sales of such foreign like product are not available or usable as a basis for determining NV, Commerce may measure dumping by comparing the EP or CEP to NV based on either: (1) sales in a third-country market, that is, sales of the foreign like product to a country other than the home market or the United States, see 19 U.S.C. § 1677b(a)(1)(B), (C); or (2) CV of the imported merchandise,

---

[2]    Typically, Commerce uses the export price when the foreign exporter sells directly to an unrelated United States purchaser.  See 19 U.S.C. § 1677a(a) (1994).  Commerce uses the constructed export price when the foreign exporter sells through a related party in the United States.  See id. § 1677a(b).

<u>see</u> 19 U.S.C. § 1677b(a)(4),[3] which is calculated pursuant to 19 U.S.C. § 1677b(e) (1994).

Profit is a component in the calculation of CV.[4]  <u>See</u> 19 U.S.C. § 1677b(e)(2)(A).  Under current antidumping law, as amended by the Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809 (1994), the preferred method for determining profit for CV is to add to CV "the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review . . . for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country[.]"  19 U.S.C. § 1677b(e)(2)(A).  The Statement

---

[3]  <u>See</u> Statement of Administrative Action ("SAA") accompanying the URAA, H.R. Doc. No. 103-316, at 839 (1994), <u>reprinted in</u> 1994 U.S.C.C.A.N. 3773, 4175 (stating that "[c]onstructed value is used . . . for normal value where home market sales of the merchandise in question are either nonexistent, in inadequate numbers, or inappropriate to serve as a benchmark for a fair price, such as where sales are disregarded because they are sold at below-cost prices").

[4]  <u>See</u> SAA at 839 ("Because constructed value serves as a proxy for a sales price, and because a fair sales price would recover [selling, general and administrative ("SG&A")] expenses and would include an element of profit, constructed value must include an amount for SG&A expenses and for profit.").

of Administrative Action[5] ("SAA") accompanying the URAA provides that Commerce may disregard sales that it considers to be outside the ordinary course of trade, that is, "Commerce may ignore sales that it disregards as a basis for normal value, such as those disregarded because they are made at below-cost prices." H.R. Doc. No. 103-316, at 839 (1994), reprinted in 1994 U.S.C.C.A.N. 3773, 4175-76; see 19 U.S.C. § 1677(15) (1994); 19 U.S.C. § 1677b(b)(1) (1994).

In promulgating its amended regulation 19 C.F.R. § 351.405 to the URAA, which deals with calculating NV based on CV, Commerce determined that it would use aggregate figures of foreign like products to calculate CV profit under the preferred methodology of 19 U.S.C. § 1677b(e)(2)(A).  See Antidumping Duties; Countervailing Duties; Proposed Rule, 61 Fed. Reg. 7308,

---

[5]  The SAA represents "an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements."  SAA at 656. "It is the expectation of the Congress that future Administrations will observe and apply the interpretations and commitments set out in this Statement."  Id. (quoted in Delverde, SrL v. United States, 21 CIT __, __, 989 F. Supp. 218, 229-30 n.18 (1997)); see also 19 U.S.C. § 3512(d) (1994) ("The statement of administrative action approved by the Congress ... shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application.").

7335 (Feb. 27, 1996) ("Proposed Regulations").    Commerce

reasoned as follows:

> The Department's practice had been to use aggregate
> figures [for selling, general and administrative
> expenses ("SG&A") and profit].    Notably, section
> 773(e)(1)(B) [i.e., 19 U.S.C. § 1677b(e)(1)(B)] of the
> pre-URAA statute provided for calculation of an amount
> for profit and SG&A "equal to that usually reflected
> in sales of merchandise of the same general class or
> kind as merchandise under consideration" (emphasis
> added).   In comparison, section 77[3](e)(2)(A) [i.e.,
> 19 U.S.C. § 1677b(e)(2)(A)] of the amended Act
> provides for use of the actual amounts incurred and
> realized for profit and SG&A "in connection with the
> production and sale of a foreign like product."   The
> use of "a" arguably could be interpreted to mean a
> particular model.   The SAA, on the other hand, refers
> to actual amounts incurred, "in selling the particular
> merchandise in question (foreign like product)."   SAA,
> at 839.   This language supports a view that the use of
> "a" was not intended to overturn our prior practice of
> relying on aggregate figures for profit and SG&A.
> Moreover, if "a" were to be interpreted literally, the
> Department would have the discretion to pick and
> choose the sale of the foreign like product from which
> profit and SG&A would be taken.   This clearly would
> undermine the predictability of the statute.   Given
> these distinctions, the amended Act arguably provides
> for a narrower basis for the calculation of profit and
> SG&A than did the prior statute.   Therefore, the
> Department intends to calculate profit and SG&A based
> on an average of the profits of foreign like products
> sold in the ordinary course of trade.

Id.


If the statutory preferred method cannot be followed under

19 U.S.C. § 1677b(e)(2)(A), "either because there are no home

market sales of the foreign like product or because all such

sales are at below-cost prices," then Commerce may calculate CV profit using one of three alternative methods in § 1677b(e)(2)(B).[6]   SAA at 840.   The SAA provides that § 1677b(e)(2)(B) "does not establish a hierarchy or preference among these alternative methods."   Id.

In this case, Commerce matched United States models to NV models according to the following methodology, in order of preference: (1) it first looked for an identical home market model; (2) if no identical match was found, it matched by family designation (i.e., similar match); and (3) for those United States models for which no identical or similar match was found, the CV of the United States model was used as the basis for NV.

---

[6]   If actual data are not available with respect to the amounts described in 19 U.S.C. § 1677b(e)(2)(A) (1994), then § 1677b(e)(2)(B) provides one of the following three alternative methods for calculating amounts for (SG&A expenses and) profit for purposes of constructed value:

> (1) actual amounts incurred or realized by the same producer on home market sales of the same general category of products; (2) the weighted-average of actual amounts incurred or realized by other investigated companies on home market sales in the ordinary course of trade (i.e., profitable sales) of the foreign like product; or (3) any other reasonable method, provided that the amount for profit does not exceed the profit normally realized by other companies on home market sales of the same general category of products (the so-called profit cap).

SAA at 840.

See NSK-RHP Bearings--Preliminary Results Analysis Memo--Antifriction Bearings from the U.K.--Sixth Administrative Review, 5/1/94-4/30/95, A-412-801, Proprietary Doc. No. 12 (Fiche 71), at 2 (July 2, 1996).

Commerce calculated profit for CV using the statutorily preferred methodology of 19 U.S.C. § 1677b(e)(2)(A). See Preliminary Results, 61 Fed. Reg. at 35,718. In particular, Commerce calculated CV profit for each respondent by aggregating each respondent's profits for the foreign like products sold in the ordinary course of trade.

In the Final Results, respondents, including RHP-NSK,[7] argued that Commerce erred in applying 19 U.S.C. § 1677b(e)(2)(A) because this section requires Commerce first try to calculate CV profit for imported merchandise based on profit amounts on the sales of the imported merchandise's 'foreign like product,' which did not exist here when NV was based on CV. See 62 Fed. Reg. at 2113.

_____

[7] Although the "Profit for Constructed Value" section of the Final Results refer only to arguments of "NSK," that is, NSK Corporation, see 62 Fed. Reg. at 2113, as abbreviated at 62 Fed. Reg. at 2085, the Court assumes that "NSK" collectively refers to RHP Bearings Ltd., NSK Bearings Europe Ltd. and NSK Corporation, as noted in plaintiffs' "General Issues Rebuttal Brief" at 1, received after the Preliminary Results by Commerce on Aug. 12, 1996.

Specifically, respondents requested that Commerce apply the same definition of "foreign like product" used for home market price calculations to determine CV profit. In other words, respondents requested that if the foreign like product is an identical bearing, CV profit should be based on profit amounts for above-cost identical bearing matches, or alternatively, if there is no identical model, CV profit should be based on the profit amounts for above-cost bearing family matches. Where there are no home market sales of identical or family bearings, respondents asserted that under 19 U.S.C. § 1677b(e)(2)(A) there can be no profits on sales of the foreign like product in the home market in the ordinary course of trade. Respondents, therefore, argued that since there were no usable sales of "foreign like product" when Commerce used CV to calculate NV, the only option for Commerce was to calculate CV profit on the basis of one of the three alternatives in § 1677b(e)(2)(B). See id. Although the three alternative methods are not listed in order of preference, respondents claimed that there is a strong preference for using the first alternative CV profit calculation, that is, "the use of company-specific data regarding the same general category of merchandise." Id. (citing 19 U.S.C. § 1677b(e)(2)(B)(i)).

Commerce disagreed with respondents that it did "not have any 'foreign like products' for use in calculating CV profit" and, therefore, it rejected their suggested model-matching methodology for calculating CV profit under 19 U.S.C. § 1677b(e)(2)(A).    Id.    Consistent with its statutory interpretation and reasoning contained in the Proposed Regulations regarding application of § 1677b(e)(2)(A), Commerce found that:

> Respondents' definition of the term "foreign like product" is overly narrow with respect to its use in the CV-profit provisions.  In applying the "preferred" method for calculating profit (as well as SG&A) under section 773(e)(2)(A) [i.e., 19 U.S.C. § 1677b(e)(2)(A)], the use of aggregate data that encompasses all foreign like products under consideration for NV represents a reasonable interpretation of the statute and results in a practical measure of profit that we can apply consistently in each case.  By contrast, an interpretation of section 773(e)(2)(A) that would result in a method based on varied groupings of foreign like products, each defined by a minimum set of matching criteria shared with a particular model of the subject merchandise, would add an additional layer of complexity and uncertainty to antidumping proceedings without generating more accurate results. It would also make the statutorily preferred CV-profit methodology inapplicable to most cases involving CV.

Id.

B.      Contentions of the Parties

1.      RHP-NSK's Contentions

RHP-NSK contends that Commerce defined "foreign like product" for purposes of the CV profit calculation in a manner contrary to the statutory definition of the term and well-established agency practice.  See Pls.' Mem. Supp. Mot. J. Agency R. at 4.  In particular, RHP-NSK asserts that 19 U.S.C. § 1677b(e)(2)(A) requires that Commerce first try to calculate CV profit for imported merchandise based on actual profit amounts incurred in the home market production and sale of "foreign like product," that is, model or family products, that match each bearing model sold in the United States.  See id. at 6, 15.

RHP-NSK notes that 19 U.S.C. § 1677(16) (1994) defines "foreign like product" by establishing three distinct categories of products for model-matching purposes.  See id. at 8.  The first category of merchandise is identical merchandise, the next category is nonidentical merchandise made by the same producer in the same country and is similar in value to the merchandise under investigation, and the third category is merchandise made by the same producer in the same country and used for the same purposes as the merchandise under investigation.  See id.  RHP-

NSK asserts that once Commerce finds merchandise in one category, merchandise in the subsequent categories can never be considered foreign like product because § 1677(16) directs Commerce to determine foreign like product in the first of the listed categories. See id. § 1677(16); see also Federal-Mogul Corp. v. United States, 20 CIT __, __, 918 F. Supp. 386, 396 (1996); Cemex, S.A. v. United States, 133 F.3d 897, 903 (Fed. Cir. 1998) (noting same for pre-URAA § 1677(16)). RHP-NSK argues, therefore, that since the plain language of § 1677(16) clearly creates a descending hierarchy for selecting foreign like product, Chevron dictates that the Court, as well as Commerce, must give effect to the unambiguously expressed intent of Congress and, thus, the reasonableness of Commerce's interpretation of 19 U.S.C. § 1677b(e)(2)(A) is irrelevant. See id. at 8-10.

RHP-NSK also argues that Commerce erred in claiming that in this review it followed its past practice of using aggregate figures for calculating CV profit. See Pls.' Reply Mem. Supp. Mot. J. Agency R. at 4. RHP-NSK notes that prior to the URAA, the antidumping law required Commerce to base CV profit on "an amount for . . . profit equal to that usually reflected in sales of merchandise of the same general class or kind as the

merchandise under consideration." Id. (quoting 19 U.S.C. § 1677b(e)(1)(B) (1988)). Citing several administrative reviews, RHP-NSK asserts that after the enactment of the URAA, Commerce continually rejected requests that it base CV profit on reported home market sales because the agency "did not consider these sales representative of the profit for the general class or kind of merchandise." Id. (citations omitted). RHP-NSK, therefore, argues that contrary to Commerce's claim, the agency in prior reviews repudiated the type of CV profit calculation performed in this review. See id.

RHP-NSK also maintains that the legislative history of the URAA confirms that Commerce should calculate CV profit on a model or family basis when using the preferred methodology under 19 U.S.C. § 1677b(e)(2)(A). See Pls.' Mem. Supp. Mot. J. Agency R. at 10. RHP-NSK notes that when Commerce revised its regulations to conform to the URAA, in particular 19 C.F.R. § 351.405, the agency specified it would use "an aggregate calculation that encompasses all foreign like products under consideration for normal value." Antidumping Duties; Countervailing Duties; Final rule ("Final Regulations"), 62 Fed. Reg. 27,296, 27,359 (May 19, 1997). RHP-NSK further notes that Commerce found this method for calculating CV profit as

"consistent with the Department's method of computing SG&A and profit under the pre-URAA version of the statute, and, while the URAA revised certain aspects of the SG&A and profit calculation, we do not believe that Congress intended to change this particular aspect of our practice." Id. Nevertheless, RHP-NSK claims that contrary to Commerce's finding, the URAA legislative history makes clear that the current preferred methodology for calculating CV profit is not consistent with Commerce's pre-URAA methodology. See Pls.' Mem. Supp. Mot. J. Agency R. at 10. The URAA legislative history, according to RHP-NSK, first recites the pre-URAA law, 19 U.S.C. § 1677b(e)(1)(B) (1988), with reference to profit amounts based on the same general class or kind as the merchandise under investigation, then announces that 19 U.S.C. § 1677b(e)(2)(A) (1994) "establishes new methods of calculating SG&A expenses and profits consistent with methods provided for in the [URAA]." Id. (quoting SAA at 839) (emphasis added). RHP-NSK specifically notes that the new § 1677b(e)(2)(A) "establishes as a general rule that Commerce will base amounts of SG&A expenses and profits only on amounts incurred and realized in connection with sales in the ordinary course of trade of the particular merchandise in question (foreign like product)." Id. at 10-11 (quoting SAA at 839)

(emphasis added). RHP-NSK, therefore, argues that the URAA legislative history directly contradicts Commerce's position and demonstrates Congress' clear intent to alter the preferred basis on which Commerce calculates CV profit. See id. at 11.

RHP-NSK further notes that after taking into account changes in nomenclature of the URAA, the first alternative methodology for CV profit, 19 U.S.C. § 1677b(e)(2)(B)(i), is nearly identical to the pre-URAA CV profit methodology, 19 U.S.C. § 1677b(e)(1)(B), except that sales at issue do not have to be in the ordinary course of trade. See id. at 11. RHP-NSK also notes that the URAA legislative history provides that "[w]ith respect to alternative (1), this methodology is consistent with the existing practice of relying on a producer's sales of products in the same 'general class or kind of merchandise.'" See id. (quoting SAA at 840). RHP-NSK, therefore, maintains that if § 1677b(e)(1)(B) is meant to be consistent with Commerce's pre-URAA practice, then necessarily § 1677b(e)(2)(A) is meant to be different. See id.

In addition, contrary to Commerce's suggestion in the Proposed Regulations that "use of 'a' was not intended to overturn [the agency's] practice of relying on aggregate figures

for profit and SG&A," RHP-NSK claims that the use of word "a" in the CV profit provision does not obliterate the explicit hierarchy for identifying "foreign like product" as established by 19 U.S.C. § 1677(16). See id. at 12. RHP-NSK argues that it makes no difference if the word "a" means "any," as in "any foreign like product," or "the," as in "the foreign like product," because the CV profit calculation is the same, that is, it must be based on a "foreign like product," not on an aggregate of products, some of which may qualify as foreign like product, but most would not. See Pls.' Reply Mem. Supp. Mot. J. Agency R. at 5.

RHP-NSK also asserts that if Commerce is correct that the term "foreign like product" permits it to use "an aggregate calculation [for CV profit] that encompasses all foreign like products under consideration for normal value," then it must also be the case that NV or cost of production ("COP") may be based on an aggregate price or cost, as appropriate, for all products under consideration for NV. Pls.' Mem. Supp. Mot. J. Agency R. at 14 (quoting 62 Fed. Reg. at 27,359). RHP-NSK appears to assert that such a conclusion is indisputably wrong because extending Commerce's definition of "foreign like product" to other key antidumping provisions would upend the

entire legal framework of the antidumping statute.  See id. at 13-14.  RHP-NSK claims that it is equally indisputable that 19 U.S.C. § 1677b(e)(2)(A) does not permit Commerce to calculate CV profit based on the aggregate profit for all sales in the above-cost foreign sales database.  See id. at 14-15.

NSK–RHP requests that the Court remand the Final Results to Commerce to calculate CV profit based on actual profit amounts incurred in the home market production and sale of model or family products that match each bearing model sold in the United States or, in the absence of such profit data, to use one of the alternative profit methodologies specified under 19 U.S.C. § 1677b(e)(2)(B).  See id. at 15.

### 2.    Commerce's Contentions

In response, Commerce asserts that it applied a reasonable interpretation of 19 U.S.C. § 1677b(e)(2)(A) and properly based CV profit for each respondent, including RHP-NSK, upon the actual profit data of that respondent.  See Def.'s Partial Opp'n to Mot. J. Agency R. at 17.  Although Commerce recognizes that 19 U.S.C. § 1677(16) establishes a descending hierarchy that articulates preferences for the type of foreign like product the agency must select for matching purposes, it, nevertheless,

claims, in essence, that where the subject merchandise is complex, encompassing numerous characteristics for matching, the foreign like product typically embraces more that one of the § 1677(16) categories. See id. at 10. Commerce contends that the term "foreign like product" is not limited to the product which is "identical" (i.e., "model-specific") or "like" (i.e., "similar to") the subject merchandise, because if neither is available, merchandise of the same "general class or kind" as the subject merchandise will qualify as the foreign like product. See id. at 10-11.

Commerce additionally claims that there is no indication by referencing to "a foreign like product" in 19 U.S.C. § 1677b(e)(2)(A), Congress intended that CV profit be calculated based on merchandise that is identical or similar to the subject merchandise. See id. at 11. Commerce also notes that CV becomes available for NV only when identical or similar home market merchandise is not available for comparison with United States sales either because there are no such home market sales or they are below-cost and, thereby, are disregarded. See id. Commerce maintains that Congress could not have intended to limit the CV profit calculation under § 1677b(e)(2)(A) to profit incurred in the production or sale of merchandise identical or similar to

the subject merchandise because, in that event, the preferred method of § 1677b(e)(2)(A) would rarely be applicable. See id. Commerce, therefore, argues that since there were sales of foreign like products that were not disregarded and actual profit amounts were realized by each respondent in connection with these sales, Commerce properly applied the preferred method by aggregating those profits. See id. at 13. To apply an alternative methodology where there are sales of the foreign like product, according to Commerce, would virtually eliminate the statutory preference to calculate CV profit based upon § 1677b(e)(2)(A). See id.

Commerce further notes that in the Proposed Regulations, see 61 Fed. Reg. at 7335, it properly determined that (1) the language of 19 U.S.C. § 1677b(e)(2)(A) is unclear; and (2) the URAA legislative history does not show that the intent of Congress was to require Commerce to make separate CV profit calculations for identical bearings or bearing families, based upon RHP-NSK's narrow interpretation of the term "foreign like product," see id. at 11-15. Commerce, therefore, argues that its statutory interpretation of calculating CV profit, as reflected in its Proposed Regulations and the Final Results, was reasonable. See id. at 12.

Moreover, Commerce disagrees with RHP-NSK's assertion that Commerce ignored the explicit hierarchy of 19 U.S.C. § 1677(16) by calculating CV profit based on profits for products from all § 1677(16) categories. See id. at 15. Citing U.H.F.C. Co. v. United States, 916 F.2d 689 (Fed. Cir. 1990) (a pre-URAA case), and Toyota Motor Sales, U.S.A., Inc. v. United States, 22 CIT __, 15 F. Supp. 2d 872 (1998) (a post-URAA case), Commerce argues that it is simply following its practice established under pre- and post-URAA law of applying the categories set forth under § 1677(16), which defines "such or similar" merchandise (now "foreign like product"), depending upon the particular context. See Def.'s Partial Opp'n to Mot. J. Agency R. at 15-17.

Because it is following established practice, Commerce also argues that there is no merit to RHP-NSK's claim that if Commerce's interpretations of the term "foreign like product" and 19 U.S.C. § 1677b(e)(2)(A) are correct, then Commerce must also use an aggregate price in calculating NV or COP. See id. at 17. Similarly, contrary to RHP-NSK's claim that Commerce expanded the meaning of the term "foreign like product" based upon the fact § 1677b(e)(2)(A) uses the term "a foreign like

product" rather than "the foreign like product" or simply "foreign like product," Commerce claims that it merely set forth its statutory interpretation that the word "a" was not intended to overturn its prior practice of aggregating figures for profit and SG&A.  See id.

Commerce, therefore, argues that the Court should sustain its CV profit determination because it is supported by substantial evidence and in accordance with law.  See id. at 17-18.

### 3.    Torrington's Contentions

In support of Commerce, Torrington first contends that 19 U.S.C. § 1677b(e)(2)(A) on its face permits a flexible application of "foreign like product" in CV profit calculations. See Torrington's Resp. to Pls.' Mem. Supp. Mot. J. Agency R. at 7.   Torrington asserts that § 1677b(e)(2)(A)'s plural expression, "profits," and flexible expression, "in connection with," carries the clear meaning and intent that Commerce may calculate CV profit from multiple sales of relevant merchandise and by reference to more than one bearing "family," so long as the models in the calculation are reasonably "connected" to the particular model for which CV is being determined.  See id.

Torrington, therefore, argues that § 1677b(e)(2)(A) does not limit Commerce to any particular narrow product-group. <u>See id.</u>

Torrington also contends that rules of statutory construction necessitates Commerce's broad and flexible interpretation of 19 U.S.C. § 1677b(e)(2)(A). <u>See id.</u> at 8. Torrington first notes that § 1677b(e)(2)(A) is the general rule and preferred basis for determining CV profit. <u>See id.</u> Torrington also notes that in most cases, CV forms NV only when a respondent reports insufficient sales of "foreign like product," as the term is narrowly understood, in the ordinary course of trade. <u>See id.</u> Accordingly, Torrington claims that if the Court construes § 1677b(e)(2)(A) narrowly in the CV profit context, it will effectively negate the general rule and preferred basis for CV profit calculations. <u>See id.</u> In support of its claim, Torrington asserts that (1) "courts [must] strive to give effect to all provisions in a statute, so as not to render a provision inoperative," <u>id.</u> (citing <u>United States v. Menasche</u>, 348 U.S. 528, 538-39 (1955)); and (2) courts must also "avoid giving statutes manifestly absurd interpretations which literal readings would otherwise support," <u>id.</u> (citing <u>United States v. Brown</u>, 333 U.S. 18, 27 (1948)). Torrington argues if the Court were to adopt RHP-NSK's position for calculating CV

profit, the Court would clearly violate both of these rules. See id.

Torrington further contends that the crux of RHP-NSK's argument is that the term "foreign like product" under 19 U.S.C. § 1677(16) must be applied with rigid consistency in two different contexts, namely, those for (1) calculating price-based NV from home market sales of comparable merchandise, and (2) calculating CV profit. See id. at 10. Torrington disagrees with RHP-NSK, arguing first that "a determination . . . can be satisfactorily made" language of 19 U.S.C. § 1677(16) clearly provides that Commerce has discretionary authority to select among the categories of identical and similar merchandise to reach a satisfactory determination. See id. In other words, Commerce has the authority to make a satisfactory determination of what is encompassed by "foreign like product" and, therefore, it acted reasonably when it based CV profit on the sales of all foreign like products. See id. at 10-11, 13.

Torrington also asserts that Commerce reasonably concluded that "foreign like product" can differ by context, that is, depending upon whether the dumping comparison is based on (1) price-to-price, or (2) price-to-CV. See id. at 11. First,

Torrington notes that when there are adequate home market sales made at above-cost prices of identical or similar merchandise, there is no need to determine profit, and the application of "foreign like product" turns to model-matching issues.  See id. Under the model-matching methodology, Torrington notes that when price-to-price comparison is not between identical merchandise, a "satisfactory" determination of "foreign like product" dictates finding the most nearly similar product in order to minimize the need for adjusting NV for difference in cost attributable to differences in physical characteristics of the merchandise compared, pursuant to 19 U.S.C. § 1677b(a)(6)(C)(ii) (1994).  See id. at 11, 13.  Otherwise, according to Torrington, if Commerce determined that similar merchandise encompassed many AFB families, it would then have a rather difficult task of making numerous and highly complex adjustments, on a part-by-part basis, and then aggregating those adjusted prices to determine final NVs.  See id. at 11-12.  Torrington thereby contends that, in the context of model-matching methodology, Commerce might reasonably give the term "foreign like product" a narrow and pragmatic application to minimize such complex adjustments.  See id. at 12.

On the other hand, Torrington notes that CV profit is

invoked only when there are no available or usable home market sales of identical or similar merchandise in the ordinary course of trade. See id. Moreover, Torrington notes that Commerce does not use an absolute price in a home-market sale for CV profit; rather, it calculates an average profit rate (i.e., based on total profits earned by total costs of goods sold) that, unlike a price for a particular bearing model, does not have to be adjusted for differences in physical characteristics between merchandise being compared. See id. Torrington claims that Commerce reasonably assumes that the profit rate earned on home market sales of all "foreign like products" is the rate that would have been earned for sales of the identical product, if sold at home in the ordinary course of trade. See id. at 12-13. Thus, Torrington asserts that "less precision in comparability is required to determine an appropriate CV profit rate than to determine appropriate models to compare." Id. at 13. Torrington, therefore, argues that, in the context of CV profit calculations, Commerce must give the term "foreign like product" a broader application so that "a determination . . . [could] be satisfactorily made," that is, a satisfactory determination on the basis of sales of all foreign like products. See id. at 12-13 (quoting 19 U.S.C. § 1677(16)).

Torrington also argues, inter alia, that, contrary to RHP-NSK's suggestion that the Court interpret the term "a foreign like product" of 19 U.S.C. § 1677b(e)(2)(A) in all contexts as referring to a singular class of identical merchandise or to a singular bearing family, the selection of the word "a" in the statute commonly means "any," and can be "applied to more than one individual object; whereas 'the' is an article which particularizes the subject spoken of." Id. at 14 (quoting Allstate Ins. Co. v. Foster, 693 F. Supp. 886, 889 (D.Nev. 1988) (quoting, in turn, Black's Law Dictionary, 1, 1324 (5th ed. 1979)). In addition, Torrington claims that judicial precedent supports construing the word "a" in a broader manner. See id. at 14-15 (citations omitted). Consistent with the common meaning and judicial precedent, Torrington asserts that the Court should sustain Commerce's interpretation that "a foreign like product" can mean "any" such product and all such products combined for purposes of calculating CV profit under § 1677b(e)(2)(A). See id. at 15.

### C.   Analysis

The issue primarily presented by RHP-NSK is whether 19 U.S.C. § 1677b(e)(2)(A) requires Commerce to calculate CV profit

based on actual profit amounts incurred in the home market production and sale of model or family bearings that match each bearing model sold in the United States or, in the absence of such profit data, to use one of the alternative profit methodologies in § 1677b(e)(2)(B).

Section 1677b(e)(2)(A) specifically provides that Commerce must base CV profit on "actual amounts incurred and realized . . . in connection with the production and sale of a foreign like product."  Similarly, the legislative history of the statute clarifies "that Commerce will base . . . profit only on amounts incurred and realized in connection with sales in the ordinary course of trade of the particular merchandise in question (foreign like product)."  SAA at 839.  Accordingly, an analysis of the statutory definition for the term "foreign like product" is critical to settle the CV profit issue RHP-NSK raises.

Title 19, United States Code, § 1677(16) sets forth, like its pre-URAA form,[8] a tripartite hierarchy for ascertaining
_____

    [8]  Title 19, United States Code, § 1677(16) (1994) revised the pre-URAA precursor, 19 U.S.C. § 1677(16) (1988), inter alia, by substituting the term "foreign like product" for "such or similar merchandise," and deleting the phrase "which is the subject of an investigation" from § 1677(16).  See SAA at 820; see generally NSK Ltd. v. United States, 190 F.3d 1321, 1329 (Fed. Cir. 1999); Cemex, S.A. v. United States, 133 F.3d 897,
                                                      (continued...)

"foreign like product."  Section 1677(16) provides:

> The term "foreign like product" means merchandise in the first of the following categories in respect of which a determination for the purposes of part II of this subtitle can be satisfactorily made:
>     (A) The subject merchandise and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.
>     (B) Merchandise–
>         (i) produced in the same country and by the same person as the subject merchandise,
>         (ii) like that merchandise in component material or materials and in the purposes for which used, and
>         (iii) approximately equal in commercial value to that merchandise.
>     (C) Merchandise–
>         (i) produced in the same country and by the same person and of the same general class or kind as the subject merchandise,
>         (ii) like that merchandise in the purposes for which used, and
>         (iii) which the administering authority determines may reasonably be compared with that merchandise.

19 U.S.C. § 1677(16) (1994).[9]  From this language, it is clear

---

[8](...continued)
902-03 (Fed. Cir. 1998) (both cases discussing pre-URAA § 1677(16)'s hierarchy for determining "such or similar merchandise").

[9]  Although a "literal" reading of 19 U.S.C. § 1677(16)'s definition of the term "foreign like product" is for "a determination for the purposes of part II" of subtitle IV of the Tariff Act of 1930, the Court nevertheless finds that general rules of statutory construction dictate part IV's § 1677(16) is applicable in this case, that is, an administrative review of a final determination pursuant to part III of subtitle IV.  See generally Freytag v. Comm'r, 501 U.S. 868, 877 (1991)
(continued...)

that Commerce must first select merchandise that is identical (i.e., model-specific) with the subject merchandise sold in, or to, the United States. See 19 U.S.C. § 1677(16)(A). If such a match is not possible, then Commerce must select merchandise that is like (i.e., similar to) the subject merchandise. See id. § 1677(16)(B). Finally, if neither identical nor like merchandise is available, merchandise of the "same general class or kind as the subject merchandise" will qualify as the "foreign like product." Id. § 1677(16)(C). In other words, as RHP-NSK correctly notes, once Commerce finds merchandise that matches the criteria stated by a § 1677(16) category, it need not consider the remaining categories because the statute specifically directs Commerce to determine "foreign like product" on the "first of the following categories in respect of which a determination . . . can be satisfactorily made." Id. § 1677(16); see Federal-Mogul, 918 F. Supp. at 396, Cemex, S.A., 133 F.3d at 903 (noting same for pre-URAA § 1677(16)).

Additionally, § 1677(16)'s "can be satisfactorily made" language indicates, as Torrington imprecisely argues, that

---

⁹(...continued)
(expressing "a deep reluctance to interpret a statutory provision so as to render superfluous other provisions in the same enactment") (citation and internal quotation marks omitted).

Commerce has the discretionary authority to select "foreign like product" in the first of the enumerated categories in which a satisfactory determination can be made. However, if a determination cannot be "satisfactorily made" relying on one of the three § 1677(16) categories, the Court notes that the statute and its legislative history are ambiguous with regard to the selection of "foreign like product" for use in calculating CV profit. Therefore, under these circumstances, the Court would have to proceed to the second step of Chevron to ascertain if Commerce's "foreign like product" selection for use in calculating CV profit was a reasonable interpretation under 19 U.S.C. § 1677b(e)(2)(A).

In this case, as noted earlier, Commerce decided that "[f]or those U.S. models which no identical or similar match was found, the CV of the U.S. model was used as the basis for the NV." NSK-RHP Bearings--Preliminary Results Analysis Memo--Antifriction Bearings from the U.K.--Sixth Administrative Review, 5/1/94-4/30/95, A-412-801, Proprietary Doc. No. 12 (Fiche 71), at 2 (July 2, 1996); see Preliminary Results, 61 Fed. Reg. at 35,718 (Commerce "used CV as the basis for NV when there were no usable sales of the foreign like product in the comparison market"). In other words, Commerce did not find

merchandise that matches the criteria of the "identical" or
"like" categories of "foreign like product" for purposes of
calculating CV profit.  See 19 U.S.C. § 1677(16)(A), (B).
Rather, in calculating CV profit, Commerce used "aggregate data
that encompasses all foreign like products under consideration
for NV" to calculate profit for CV.  Final Results, 62 Fed. Reg.
at 2113.  The Court finds that use of such aggregate data
matches the criteria of § 1677(16)(C)'s "same general class or
kind" category and, therefore,[10] Commerce's determination under
19 U.S.C. § 1677b(e)(2)(A) was in accordance with law.

---

[10]    In its brief, Commerce advanced the position that
"[w]here . . . the subject merchandise is complex, encompassing
numerous characteristics for matching, the foreign like product
typically embraces more than one of the categories established
in section 1677(16)."  Def.'s Partial Opp'n to Mot. J. Agency R.
at 10.  The Court, however, cannot defer to this post hoc
rationalization as a basis to uphold or overturn Commerce's
decision to rely on aggregate data for "foreign like product"
because Commerce's final determination must be sustained, if at
all, on the same basis articulated in the determination by
Commerce itself.  See Burlington Truck Lines, Inc. v. United
States, 371 U.S. 156, 168-69 (1962) ("The courts may not accept
. . . counsel's post hoc rationalizations for agency action; .
. . an agency's discretionary order [must] be upheld, if at all,
on the same basis articulated in the order by the agency
itself."); see also Martin v. Occupational Safety and Health
Review Comm'n, 499 U.S. 144, 156 (1991) ("[A]gency 'litigating
positions' are not entitled to deference when they are merely .
. . counsel's 'post hoc rationalizations' for agency action,
advance for the first time in the reviewing court."); Bowen v.
Georgetown Univ. Hosp., 488 U.S. 204, 213 (1988) ("Deference to
what appears to be nothing more than an agency's convenient
litigating position would be entirely inappropriate.").

Moreover, the Court notes that since Commerce found that there were sales of foreign like products that were not disregarded and actual profit amounts were realized by RHP-NSK in connection with these sales for use in calculating CV profit under § 1677b(e)(2)(A), see id., the three alternative CV methodologies in § 1677b(e)(2)(B) are in applicable, see 19 U.S.C. § 1677b(e)(2)(B) (stating that subparagraph (B) is applicable when "actual data are not available with the respect to the amounts described in subparagraph (A)"). Furthermore, in examining the structure of § 1677b(e), the Court concludes, as Commerce argued, that to apply one of § 1677b(e)(2)(B)'s alternative methodologies where there are such sales of the foreign like products would virtually eliminate the statutory preference to calculate CV profit based upon § 1677b(e)(2)(A). The Court also finds that the URAA legislative history supports the use of such actual profit data under § 1677b(e)(2)(A) to compute CV profit before resorting to § 1677b(e)(2)(B)'s alternative methodologies. See SAA at 839-40. In addition, having reviewed the record, the Court finds that Commerce's factual determinations concerning CV profit calculations are supported by substantial evidence. Accordingly, Commerce's CV profit methodology is affirmed.

The Court declines to address RHP-NSK's arguments concerning 19 C.F.R. § 351.405 conforming to the URAA because the revised regulation became effective for all administrative reviews initiated on the basis of requests made on or after July 1, 1997 and, therefore, is not applicable in this case. See 19 C.F.R. § 351.701 (1998) (clarifying applicability dates for regulations under 19 C.F.R. § 351); see also Final Regulations, 62 Fed. Reg. at 27,358-59 (discussing final amended regulation 19 C.F.R. § 351.405 and determination of product categories for calculating SG&A and profit for CV under 19 U.S.C. § 1677b(e)(2)(A)).

**II. Inclusion of Zero-Priced Samples Transactions in RHP-NSK's United States Sales Database**

During this review, Commerce included in RHP-NSK's United States sales database free sample bearings given away at no charge to potential United States customers. See Final Results, 62 Fed. Reg. at 2123. RHP-NSK argues that this case should be remanded to Commerce with instructions, pursuant to NSK Ltd. v. United States, 115 F.3d 965 (Fed. Cir. 1997), to exclude RHP-NSK's zero-priced sample transactions from the dumping margin calculations. See Pls.' Mem. Supp. Mot. J. Agency R. at 4-5, 15-16; Pls.' Reply Mem. Supp. Mot. J. Agency R. at 9-10.

Commerce agrees that a remand under <u>NSK</u> is proper and that, on remand, it should exclude from RHP-NSK's United States sales database those sample transactions for which RHP-NSK received no consideration. <u>See</u> Def.'s Partial Opp'n to Mot. J. Agency R. at 2-3, 18.

Although Torrington concedes that <u>NSK</u> holds that sales must be for consideration to be cognizable under the antidumping law, Torrington nevertheless argues that RHP-NSK failed to meet its burden of proving that the transactions in question were free of broader forms of consideration, that is, consideration other than money and, therefore, no remand is necessary. <u>See</u> Torrington's Resp. to Pls.' Mem. Supp. Mot. J. Agency R. at 16-18. In the alternative, Torrington argues that if a remand is ordered, the Court should not rule that RHP-NSK's sample transactions should be categorically excluded; rather, it should instruct Commerce to reevaluate the record to determine whether RHP-NSK's sample transactions are in fact without consideration. <u>See id.</u> at 16, 18.

Commerce is required to impose antidumping duties upon merchandise that "is being, or is likely to be, sold in the United States at less than its fair value." 19 U.S.C. § 1673(1)

(1994). A zero-priced transaction, however, does not qualify as a "sale" and, therefore, cannot be included in Commerce's dumping margin calculations. See NSK, 115 F.3d at 975 (holding "that the term 'sold,' as used in 19 U.S.C. §§ 1673 and 1677a(c), requires both a transfer of ownership to an unrelated party and consideration"). Thus, the distribution of AFBs for no consideration falls outside the purview of § 1673. Consequently, the Court remands to Commerce to exclude from RHP-NSK's United States sales database any sample transactions that were not supported by consideration and to adjust the dumping margins accordingly.

## III. Inclusion of Imputed Inventory Carrying Costs in the CEP Offset When Comparing CEP Sales to CV

In the Final Results, Commerce "regard[ed] the inventory carrying costs [RHP-NSK] incurred in the home market, which are incurred prior to the sale, transfer, or shipment of the merchandise to the U.S. affiliate, as an expense incurred on behalf of the sale to the U.S. affiliate." 62 Fed. Reg. at 2124. Commerce did not consider this to reflect a commercial activity in the United States and, therefore, it did not deduct domestic inventory carrying costs from CEP for the Final Results. See id.

RHP-NSK claims that Commerce correctly complied with the CEP offset provision, 19 U.S.C. § 1677b(a)(7)(B) (1994), by including inventory carrying costs in the CEP offset when it matched CEP sales to home market price-based NVs, but it violated the statute when it failed to include imputed inventory carrying costs in the CEP offset when it matched CEP sales to CV. See Pls.' Mem. Supp. Mot. J. Agency R. at 5, 16-17. RHP-NSK notes that Commerce corrected this clerical error in the subsequent AFB review when it included inventory carrying costs in the CEP offset for CEP sales matched to CV. See id. at 5 (citing Antifriction Bearings from Japan-NSK Ltd. (NSK) Preliminary Results Analysis Memo Seventh Administrative Review 5/1/95-4/30/96, A-588-804, Proprietary Document, at 10-11 (Mar. 28, 1997)). RHP-NSK requests that the Court remand the issue and instruct Commerce to include inventory carrying costs in the CEP offset when matching CEP sales to CV. See id. at 17. Commerce agrees with RHP-NSK's remand request. See Def.'s Partial Opp'n to Mot. J. Agency R. at 3, 18.

Torrington disagrees with RHP-NSK, noting that although under Commerce's prior practice "deductions from exporter's sale price (now called [CEP]) included imputed costs for carrying

inventory from the time the merchandise left the home market factory to the time of its shipment to the first unrelated customer in the United States," Commerce's practice under the new law, on the United States side, is not to deduct "the cost of carrying inventory from the time the merchandise leaves the factory to the time of the sale to the U.S. affiliate." Torrington's Resp. to Pls.' Mem. Supp. Mot. J. Agency R. at 19. Thus, Torrington argues that the rationale for an offsetting deduction has evaporated. See id. In the alternative, Torrington contends that if a remand is ordered, the Court should instruct Commerce to ensure that the sum of the average imputed financial expenses (i.e., both imputed credit and imputed inventory carrying costs) deducted from CV do not exceed the per-unit actual interest expenses included in the CV-buildup. See id. Torrington explains that since 19 U.S.C. § 1677b(e) requires that CV be "equal to" all actual costs of materials and fabrication, SG&A and profit, deductions of imputed financial expenses greater than the reported actual amounts will result in the unlawful diminution of the reported costs. See id. at 19-20. Torrington, therefore, asserts that if a remand is ordered, Commerce's margin calculation program should be modified to include an appropriate cap on the

deduction of average imputed expenses from CV.  See id. at 20.

Title 19, United States Code, § 1677b(a)(1)(B) requires Commerce to establish NV to the extent practicable, at the same level of trade ("LOT") as the EP or CEP.  When Commerce is unable to match United States sales with foreign market sales at the same LOT, an adjustment to NV should be made to account for the differences in price that result from the differences in LOT.  See 19 U.S.C. § 1677b(a)(7)(A).  When the data available does not provide an appropriate basis to grant a LOT adjustment under § 1677b(a)(7)(A), but NV is established at a LOT constituting a more advanced stage of distribution than the LOT of the CEP, the statute ensures a fair comparison between United States price and NV by reducing NV by what is known as the "CEP offset."  See 19 U.S.C. § 1677b(a)(7)(B) (CEP offset is an adjustment that is made to NV when NV is being compared to CEP sales in the United States).  Specifically, the CEP offset adjustment is made by reducing NV "by the amount of indirect selling expenses incurred in the country in which [NV] is determined on sales of the foreign like product," but this deduction may not exceed (i.e., it is "capped" by) the amount of the indirect selling expenses deducted in calculating CEP.  See id.  Since the inventory carrying costs at issue constitute an

indirect selling expense incurred in the home market on the sales of the foreign like product, the Court, therefore, remands to Commerce to include the imputed inventory carrying costs in the calculation of CEP offset for RHP-NSK when matching CEP sales to CV. See generally Notice of Final Determination of Sales at Less Than Fair Value: Static Random Access Memory Semiconductors From Taiwan, 63 Fed. Reg. 8909, 8915 (Feb. 23, 1998) (Commerce included inventory carrying costs in the CEP offset for CEP sales matched to price-based NVs and CV).

### CONCLUSION

For the foregoing reasons, the case is remanded to Commerce to: (1) exclude from RHP-NSK's United States sales database any sample transactions that were not supported by consideration and to adjust the dumping margins accordingly; and (2) include imputed inventory carrying costs in the calculation of CEP offset for RHP-NSK when matching CEP sales to CV. Commerce's final determination is affirmed in all other respects.

_____
NICHOLAS TSOUCALAS
SENIOR JUDGE

Dated: December 16, 1999
       New York, New York

**ERRATUM**

Slip Op. 99-134

<u>RHP BEARINGS LTD.  v. UNITED STATES</u>

Consol. Court No. 97-02-00217


On page 2, second full paragraph, the first sentence after **Held:** should read as follows:

RHP-NSK's motion is denied in part and granted in part.



December 16, 1999

**ERRATUM**

Slip Op. 99-134

RHP BEARINGS LTD.  v. UNITED STATES

Consol. Court No. 97-02-00217

      On page 24, line 2, which reads as "typically embraces more that one" should read as follows:

      "typically embraces more than one "

April 19, 2000